COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Felton, Judges Benton, Elder, Frank, Humphreys, Clements,
          Kelsey, Haley, Petty and Beales
Argued at Richmond, Virginia


KEITH ISIAH GLENN

                                                        OPINION BY
v.        Record No. 2390-04-2            JUDGE D. ARTHUR KELSEY
                                                        MARCH 20, 2007

COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF COLONIAL HEIGHTS
Herbert C. Gill, Jr., Judge[*]

Kevin Purnell (Dinkin & Purnell, PLLC, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General; Josephine F. Whalen, Assistant
Attorney General, on brief), for appellee.


Following the entry of a conditional guilty plea, the trial court convicted Keith I. Glenn

of robbery and conspiracy to commit robbery. On appeal, Glenn argues that the trial court erred

in denying his motion to suppress. A divided panel of this Court agreed with Glenn and vacated

his convictions. Glenn v. Commonwealth, 48 Va. App. 556, 633 S.E.2d 205 (2006). At the

Commonwealth's request, we set aside our panel opinion and reconsidered the matter *en banc*.

Finding no error in the trial court's decision, we now affirm Glenn's convictions.

I.

On appeal from a denial of a suppression motion, we review the evidence "in the light

most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Kyer v.

Commonwealth, 45 Va. App. 473, 477, 612 S.E.2d 213, 215 (2005) (*en banc*) (citation omitted).

_____

[*] Judge Frederick G. Rockwell, III denied Glenn's motion to suppress.

Believing Glenn had just robbed a man, police officers went to the home of Glenn's grandparents where Glenn had been living for about two months. Glenn answered the door and was immediately arrested. The officers asked Glenn's grandfather for permission to search his home. Unable to speak because of a medical condition, the grandfather nodded his head in agreement. The officers then asked the grandfather if Glenn paid rent. The grandfather shook his head no. When asked if Glenn was in fact his grandson, the grandfather nodded yes.

The officers went to a bedroom identified by Glenn as the "room he slept in" and found, among other things, boxes containing his grandmother's clothing. The officers then went to a second room, identified by Glenn as a room that he also slept in on occasion. There, the officers discovered a backpack on the floor. Nothing suggested to the officers the backpack was locked, used for any particular purpose, or owned by any particular person. The officers opened the backpack and found the robbery victim's cell phone. When questioned later about the robbery, Glenn gave police a full confession.

Prior to trial, Glenn filed a motion to suppress seeking to exclude from evidence the cell phone found in the backpack.[1] At the suppression hearing, Glenn's grandmother testified that the backpack belonged to Glenn. The grandmother, however, conceded that Glenn did not pay rent. Nor did he have exclusive access to, or control over, any room in the house. She agreed to the characterization of the first room searched as "Keith's room" and "his bedroom." The woman's clothes in Glenn's bedroom were hers, she admitted. She also said she kept a box of her clothes in the second room. There were no locks on the doors of either room. The police officers added that the doors of both rooms were open at the time of their search.

---

[1] Glenn also filed a motion to suppress his confession on Fifth Amendment grounds. The trial court overruled that motion. Pursuant to Code § 17.1-407(D), a three-judge panel of this Court denied Glenn's petition for appeal on this ground.

The trial court denied Glenn's motion to suppress, reasoning that the grandfather's consent to search was given "without reservation or qualification." The scope of this consent, the court held, provided the officers with apparent authority to search the entire house and to open the backpack found during the search. Following the trial court's denial of his motion to suppress, Glenn entered a conditional guilty plea pursuant to Code § 19.2-254 and appealed his convictions for robbery in violation of Code § 18.2-58 and conspiracy to commit robbery in violation of Code § 18.2-22.

## II.

Though the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* appellate scrutiny, "we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003) (citation omitted). "To prevail on appeal, the defendant must show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the prosecution, was reversible error." Id. at 105, 582 S.E.2d at 450 (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003)).

In this case, Glenn argues that his grandfather's consent to search the home did not extend to opening the backpack and examining its contents. The trial court disagreed, as do we.

Under settled Fourth Amendment principles, "a search authorized by consent is wholly valid." Kyer, 45 Va. App. at 483, 612 S.E.2d at 218 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). "Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding." Barkley v. Commonwealth, 39 Va. App. 682, 696, 576 S.E.2d 234, 241 (2003) (citation omitted).

Consent to search can be given by one with actual authority or apparent authority. Actual authority exists if the consenting party has a privacy interest in the premises to be searched, and thus, a concomitant right to waive that interest and authorize the search. See United States v. Matlock, 415 U.S. 164, 170-71 (1974). Apparent authority exists if it merely *appears* to a reasonable officer that the consenting party has "authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 188 (1990). When multiple parties share privacy interests in the premises, any one of them with "common authority over the premises" may consent to the search despite the lack of express concurrence by others possessing a shared privacy interest. Id. at 181.

Here, the trial court found that the grandfather owned the home and consented to its search. The police knew Glenn was staying in his grandfather's home and confirmed Glenn did not have the status of a renter. From these facts, the police had ample reason to accept the grandfather's consent to search the home and every room in it. No circumstances suggested to the police that Glenn had preserved a private enclave within the home or had somehow undermined the grandfather's access to, or authority over, any space within his home. The police, therefore, crossed no Fourth Amendment boundary by searching either of the two rooms in which Glenn slept.

Perhaps so, Glenn argues, but that boundary was crossed when the police opened the backpack and looked inside. We disagree. Consent to search a space generally includes consent to search containers within that space. See Florida v. Jimeno, 500 U.S. 248, 251 (1991). This principle applies to automobiles, Wyoming v. Houghton, 526 U.S. 295, 302 (1999), as well as physical premises, United States v. Melgar, 227 F.3d 1038, 1041-42 (7th Cir. 2000). "The rule regarding containers found in automobiles applies also to containers found in premises." 27 James W. Moore *et al.*, Moore's Federal Practice & Procedure § 641.44, at 641-151 (3d ed. 2006). "A grant of consent to search premises includes consent to search closed containers

found within the premises *unless* the officers have reliable information that the container is not under the control of the person granting consent." Id. (emphasis added); see also State v. Odom, 722 N.W.2d 370, 373 (N.D. 2006) ("Specific consent to search every container is not needed when consent to search a room is given."); see generally 4 Wayne R. LaFave, Search and Seizure § 8.3(g), at 183 (4th ed. 2004).

This conclusion stems from the observation that a "lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." United States v. Ross, 456 U.S. 798, 820-21 (1982) (footnote omitted). The consent to search a home may reasonably include the "authority to open closets, chests, drawers, and containers" in which the object of the search may be found. Id. at 821; see also United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997). "When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." Ross, 456 U.S. at 821 (footnote omitted). This reasoning "applies equally to all containers, as indeed we believe it must." Id. at 822.

Practically speaking, "the real question for closed container searches is which way the risk of uncertainty should run." Melgar, 227 F.3d at 1041. "Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search . . . or is it permissible if the police do not have reliable information that the container is *not* under the authorizer's control." Id. (emphasis in original). We agree with the Seventh Circuit that it must be the latter. Any different approach

> would impose an impossible burden on the police. It would mean that they could never search closed containers within a dwelling . . .

> without asking the person whose consent is being given *ex ante* about every item they might encounter. We note that there is no possibility of such a rule for automobile searches, because the Supreme Court has already authorized this type of container search in that context. <u>See</u> <u>Ross</u>, *supra*; <u>Houghton</u>, *supra*. Our conclusion here rests in part on the discussion in <u>Houghton</u> that indicates that the container rule rests on general principles of Fourth Amendment law that do not depend on the special attributes of automobile searches.

<u>Melgar</u>, 227 F.3d at 1042 (emphasis in original); <u>see</u> <u>also</u> <u>Ladell</u>, 127 F.3d at 624 (holding that a mother had "apparent authority to consent" to a search of her adult son's bedroom, including a closed vinyl bag found in the bedroom).[2]

Reinforcing these traditional principles, <u>Georgia v. Randolph</u>, 126 S. Ct. 1515, 1520 (2006), addressed the underpinnings of the apparent authority doctrine as applied to the "co-occupant consent" situation. <u>Randolph</u> recognized that police must be permitted to rely on "widely shared social expectations" when discerning the apparent authority of one person to consent to a search of an area in which another has a dual privacy interest, particularly if the relationship between them falls into "some recognized hierarchy" apparent to the officers. <u>Id.</u> at 1521, 1523.

"Disputed permission," however, undermines that reliance because no reasonable officer could rely on one co-inhabitant's apparent authority to speak for another when the person spoken for is, at that very moment, "expressly refusing consent" to the search. <u>Id.</u> at 1524, 1526. But if

---

[2] The dissent comes to the opposite conclusion based on the belief that an individual has a "heightened expectation of privacy in the contents of a closed container." *Post* at 10; <u>see</u> <u>also</u> <u>Glenn v. Commonwealth</u>, 48 Va. App. 556, 569, 633 S.E.2d 205, 212 (2006). This proposition, however, was accepted only by the two-Justice dissent in <u>Jimeno</u> (from which the quoted language comes), not from the <u>Jimeno</u> majority's reasoning or holding. <u>Florida v. Jimeno</u>, 500 U.S. 248, 253 (1991) (Marshall & Stevens, JJ., dissenting). We also find unpersuasive the dissent's reliance on <u>United States v. Chadwick</u>, 433 U.S. 1, 13 (1977), given that it has been expressly abrogated (in favor of the reasoning in <u>Ross</u>) by <u>California v. Acevedo</u>, 500 U.S. 565, 573, 578 (1991) (applying <u>Ross</u> and agreeing with the "<u>Chadwick</u> dissenters" who "predicted that the container rule would have 'the perverse result of allowing fortuitous circumstances to control the outcome' of various searches" (citation omitted)).

the spoken-for inhabitant does not object, the speaking inhabitant's apparent authority remains

secure. As the majority in Randolph conceded, "we have to admit that we are drawing a fine

line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the

co-tenant's permission does not suffice for a reasonable search, whereas the potential objector,

nearby but not invited to take part in the threshold colloquy, loses out." Id. at 1527. This

approach places the burden on the potential objector to assert his objection. For the very reason

that

> it would be unjustifiably impractical to require the police to take
> affirmative steps to confirm the actual authority of a consenting
> individual whose authority was apparent, we think it would needlessly
> limit the capacity of the police to respond to ostensibly legitimate
> opportunities in the field if we were to hold that reasonableness
> required the police to take affirmative steps to find a potentially
> objecting co-tenant before acting on the permission they had already
> received.

Id. If this were not the rule, "every co-tenant consent case would turn into a test about the

adequacy of the police's efforts to consult with a potential objector." Id. at 1527-28.

Consistent with these principles, we hold the police officers had reasonable grounds to

believe that the grandfather's consent to search his house included permission to open a

backpack found on the floor in one of the rooms. The grandfather owned the home and had not

encumbered his prerogatives as a homeowner by entering into any sort of contractual

relationship with Glenn. His relationship with Glenn was not one of landlord-tenant, but of

grandfather-grandson.

Equally important, nothing about the backpack itself put the officers on notice that Glenn

claimed an *exclusive* privacy interest in it. The backpack had no lock or, for that matter,

anything else ostensibly designed to inhibit someone from opening it. The backpack was found

on the floor of a room sometimes used by Glenn, not squirreled away in some secretive place

within his principal bedroom. No identifying information on the backpack revealed who owned

it, used it, or had access to it.  The officers did not know who left it there or who, if anyone, intended to come back for it.  Under such circumstances, the officers were not required to speculate — as Glenn implicitly suggests — that grandsons, but never grandfathers, use backpacks.

III.

Applying settled principles of apparent authority, we hold the grandfather's unqualified consent to search his house included permission to open an unlocked, unidentified, unclaimed backpack found in plain view on the floor of one of its rooms.[3]  Because the trial court correctly denied Glenn's motion to suppress, we affirm his convictions for robbery and conspiracy to commit robbery.

Affirmed.

---

[3] Given our holding, we need not address the Commonwealth's additional argument that Glenn's confession renders harmless any error associated with the suppression ruling.  The grant of *en banc* review vacates the prior panel opinion *in toto*, including its holding that harmless error principles do not apply to appeals of conditional guilty pleas.  We thus do not resolve the differing views expressed by the panel majority and dissent on this subject.  Cf. Glenn, 48 Va. App. at 577-87, 633 S.E.2d at 216-21 (rejecting harmless error), with id. at 598-604, 633 S.E.2d at 226-29 (applying harmless error).

Humphreys, J., with whom Benton, Elder and Clements, JJ., join, dissenting.

From a nod of the head from an elderly stroke victim, the majority finds apparent authority, as a matter of law, to search not merely a home, but any closed containers found within. Moreover, the majority finds that no "reasonableness" standard requires law enforcement officers to clarify the scope of such consent, despite such officers having ready access to all the individuals who might possess a reasonable expectation of privacy over the premises and any closed containers within. Because I find no authority in constitutional precedent for such an expansive view of the Fourth Amendment waiver doctrine, I respectfully dissent.

### I. The Scope of the Consent

I agree with the majority that in this case, Glenn's grandfather—the owner of the premises—"shar[ed] common authority" over the bedroom and, thus, possessed the actual authority to consent to a search of that room. See, e.g., Georgia v. Randolph, 126 S. Ct. 1515, 1520 (2006) (Although the Fourth Amendment "ordinarily prohibit[s] the warrantless entry of a person's house as unreasonable *per se*, one 'jealously and carefully drawn' exception recognizes the validity of searches [conducted pursuant to] the voluntary consent of an individual possessing authority" to give that consent.); Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Matlock, 415 U.S. 164, 170 (1974) (Individuals who possess the authority to consent to the search of a premises include a fellow occupant who shares common authority over property.); see also Bryant v. Commonwealth, 39 Va. App. 465, 470-72, 573 S.E.2d 332, 335 (2002); Jones v. Commonwealth, 16 Va. App. 725, 727-28, 432 S.E.2d 517, 519 (1993); Caldwell v. Commonwealth, 15 Va. App. 540, 542, 425 S.E.2d 534, 535 (1993). Thus, I agree that the general search of the premises, including the bedroom, did not violate Glenn's Fourth Amendment rights. See Matlock, 415 U.S. at 171 ("Permission to search [may be] obtained

from a third party who possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected.").

However, I must part company with the majority with respect to whether the grandfather's consent to the search of his home also vested the officers with the authority to open and search Glenn's backpack. See Randolph, 126 S. Ct. at 1522 (noting, for example, that, "when it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on the premises as an occupant may lack any perceived authority to consent"); United States v. Karo, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring) (stating that when a third party gives consent to search a room, that person is not necessarily consenting to a search of the closed containers within the room). For the following reasons, I would hold that it did not.

According to settled principles, a third party, with standing to do so, may validly consent to the search of a closed container, even though the actual owner of the container has a heightened expectation of privacy in its contents. See, e.g., Frazier v. Cupp, 394 U.S. 731, 740 (1969) (cousin had authority to consent to search of the defendant's duffel bag, which both men used and which had been left in the cousin's home); United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997) (holding that a mother could consent to a search of her adult son's bedroom, including a closed duffle bag stored in between the mattresses on the bed); United States v. Richardson, 562 F.2d 476 (7th Cir. 1977) (holding that a woman can consent to a search of a bedroom, shared by herself and the man she lived with, including the closet); see also Florida v. Jimeno, 500 U.S. 248, 253 (1991) (Marshall, J., dissenting) (stating that, "an individual has a heightened expectation of privacy in the contents of a closed container"); United States v. Chadwick, 433 U.S. 1, 13 (1977) ("[A] person's expectations of privacy in personal luggage are substantially greater than in an automobile."). But, consent to search a private container, such as

a suitcase or backpack, is only effective if given by someone "with common authority over or other sufficient relationship to the . . . effects sought to be inspected." Matlock, 415 U.S. at 171. Common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes." Id. at 171 n.7.

The burden of proving the effectiveness of a third party's consent rests with the Commonwealth. United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992) (citing Rodriguez, 497 U.S. 177). The Commonwealth can meet this burden by (1) coming "forward with persuasive evidence of both shared use and joint access to or control over a searched area, which would demonstrate actual authority to consent," (2) "show[ing] that the owner of the property to be searched has expressly authorized a third party to give consent to the search," or (3) "establish[ing] consent by means of the apparent authority doctrine." United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993) (internal citations omitted).

In this case, the issue is whether the Commonwealth established that the grandfather had the *apparent* authority to consent to a search of the backpack.[4] Id. When determining whether an individual possesses apparent authority to consent to a search, the relevant inquiry is whether, under the totality of the circumstances, an objectively reasonable officer would "conclude that the person providing consent had the requisite authority to do so." Bryant, 39 Va. App. at 471, 573 S.E.2d at 335.

---

[4] There is no evidence to suggest that the grandfather possessed the *actual* authority to consent to a search of the backpack. Specifically, the Commonwealth presented no evidence— much less "persuasive" evidence—from which it could be inferred that the grandfather owned, used, or was able to freely access either the backpack or its contents. See Welch, 4 F.3d at 764. Indeed, Glenn's grandmother testified that neither she nor Glenn's grandfather ever used the backpack. Thus, it follows that the Commonwealth failed to prove that the grandfather possessed the actual authority to consent to a search of the backpack. Nor did the Commonwealth present any evidence indicating that Glenn had given his grandfather express authorization to consent to a search of the backpack. See id.

To establish that a third party has the apparent authority to consent to the search of a closed container, the Commonwealth must prove that an objectively reasonable police officer would have believed that the third party had "joint access or control for most purposes" of that container. Matlock, 415 U.S. at 171 n.1 (noting that authority to consent "rests on mutual use of the property by persons generally having joint access or control for most purposes" of the item or area being searched). This determination must be judged by the facts available to the officer at the moment the officer conducted the search. See Rodriguez, 497 U.S. at 185-86. Accordingly, if the facts, as the officer reasonably believed them to be, would have justified an objectively reasonable belief that the third party either owned or maintained joint access or control for most purposes over a closed container found within the area being searched, the resulting search of that closed container does not violate the Fourth Amendment. United States v. Whitfield, 939 F.2d 1071, 1075 (D.C. Cir. 1991); see also United States v. Basinski, 226 F.3d 829, 834 (7th Cir. 2000) ("[A]pparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property.").

Relying principally on Ross, Jimeno, and United States v. Melgar, 227 F.3d 1038, 1041-42 (7th Cir. 2000), the majority finds in a general consent to search a home, apparent authority for a complete waiver of Fourth Amendment protections over any containers found within. In my view, the analysis of the majority improperly conflates two distinct constitutional principles: the proper scope of a consent to search and the proper scope of a warrantless search based upon probable cause. In this case, it matters not a whit where the evidence the police were seeking might be found. The only issue is the contextual breadth of Glenn's grandfather's waiver of Fourth Amendment protection.

Unlike the majority, I do not read either Ross[5] or Jimeno,[6] both of which were automobile search cases, as retreating from the fundamental principles laid down in Chambers v. Maroney, 399 U.S. 42 (1970). As Justice White noted in Chambers,

> the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction . . . .

Chambers, 399 U.S. at 48. Moreover, Wyoming v. Houghton, 526 U.S. 295, 303 (1999), reiterated the Supreme Court's recognition of the reduced expectation of privacy in automobiles stating,

> drivers[] possess a reduced expectation of privacy with regard to the property that they transport in cars, which travel public thoroughfares, seldom serve as . . . the repository of personal effects, are subjected to police stop and examination to enforce pervasive governmental controls as an everyday occurrence, and, finally, are exposed to traffic accidents that may render all their contents open to public scrutiny.

(Internal citations omitted).

---

[5] In Ross, the United States Supreme Court "consider[ed] the extent to which police officers—who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it—may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view." Ross, 456 U.S. at 800. The Court held that officers "may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant 'particularly describing the place to be searched.'" Id. In other words, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id. at 825.

[6] In Jimeno, the United States Supreme Court found that once a suspect gives a police officer permission to search his automobile, the officer can, without violating the Fourth Amendment, open a closed container found within the car that might reasonably hold the object of the search. Jimeno, 500 U.S. at 249.

Here, in contrast to an automobile, the locus of this search was a home, and a closed and constitutionally protected backpack within that home.[7] Thus, I find the issue in this case to be anything but complex. It is simply whether, when considering the totality of the circumstances, an objective police officer could have reasonably believed that the grandfather used, controlled, or had unrestricted access to the backpack and its contents. The majority answers this question in the affirmative based solely upon the presence of the backpack in the home. The majority ignores the fact that the rooms and the backpack were searched solely because of their nexus to Glenn, and not because of any nexus to his grandfather.

The record, when viewed in the light most favorable to the Commonwealth, establishes that Glenn lived with his grandparents, but did not have exclusive control over the rooms searched. However, the record also establishes that Officer Ferguson focused his search

---

[7] The majority shuns my reliance on Chadwick because "it has been expressly abrogated" by California v. Acevedo, 500 U.S. 565, 578 (1991). I agree that Acevedo and Ross clarify an area of the law that had "confused the courts," specifically, the extent to which an officer, with probable cause, may search a vehicle and its containers without a warrant. Acevedo, 500 U.S. at 578. However, Acevedo only reiterates the holding in Ross stating, "'[t]he scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found.'" Acevedo, 500 U.S. at 579-80 (quoting Ross, 456 U.S. at 824). In other words, Acevedo "eliminate[s] the warrant requirement for closed containers" within *automobiles*. Id. at 579. Acevedo clearly indicates that "automobile searches differ from other searches," id. at 578, and thus, I believe that it does not govern the outcome of the case at hand.

Moreover, Acevedo does not abrogate the Fourth Amendment's protection of "the right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and its application as expressed in Chadwick to closed containers, including those inside a home, that may carry a heightened expectation of privacy. The long-standing principle of apparent authority that common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes," Matlock, 415 U.S. at 171 n.7, recognizes that although individuals may have joint access to rooms within a home, they may not necessarily have joint access to closed containers within that room. Cf. Cupp, 394 U.S. at 740 (By allowing his cousin Rawls "to use the bag" and by "leaving it in his house," the defendant "assumed the risk that Rawls would allow someone else to look inside."). The holdings in the automobile exception cases— Ross, Acevedo, and the like— do not persuade me that when dealing with apparent authority, and the scope of a consent to search, the Supreme Court has abandoned this constitutional principle.

exclusively on the rooms identified by Glenn as those he "slept in." In fact, the room in which Officer Ferguson found the backpack had a pair of men's pants on the bed, men's clothing hanging in the closet, a cell phone lying on the closet floor, and a backpack on the bedroom floor.

With respect to the backpack, it was closed, but not locked or otherwise sealed shut. Cf. United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978) (although mother could consent to search of house, she could not consent to search of locked footlocker found in her son's room). The backpack was not tucked under the mattress or otherwise hidden from view, cf. Commonwealth v. Sardone, 10 Mass. L. Rep. 97 (Super. Ct. 1999) (mother could not consent to the search of her son's knapsack that was at least partially under the foot of the bed in an area not visible from the door), and there were no marks or tags on the backpack that would indicate its ownership. From these facts, the question of whether the grandfather owned, used, or otherwise controlled the backpack was ambiguous, at best.

Given awareness by the police officers of the ambiguities present here with respect to the apparent ownership of the backpack, I would hold that the police could not "infer such authority [to search the backpack] merely from [the consenter's] ownership of the house." Salinas-Cano, 959 F.2d at 866 (internal quotations omitted) (second alteration in original)); State v. Tonroy, 92 P.3d 1116, 1120 (Kan. Ct. App. 2004) ("[C]onsent by an owner or tenant of a residence does not necessarily give the police consent to search closed containers within the residence that belong to others."). See also Basinski, 226 F.3d at 834 ("For purposes of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents."); Salinas-Cano, 959 F.2d at 866 ("To hold that an officer may reasonably find authority to consent solely on the basis of the presence of a [container] in the home of another would render meaningless the Fourth

Amendment's protection of such [containers].").  Indeed, the evidence supports only one reasonable inference.  That is, the backpack was opened and searched because Officer Ferguson believed it belonged to Glenn, and not because he believed it belonged to his grandfather.

Moreover, although not clearly addressed by the Supreme Court of the United States, many lower courts have held that the burden of proving apparent authority "'cannot be met if [law enforcement] agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.'"  Salinas-Cano, 959 F.2d at 864 (quoting United States v. Whitfield, 939 F.2d 1071, 1075 (D.C. Cir. 1991)).  Thus, if the officers "do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then [a] warrantless [search] is unlawful without further inquiry.'"  Id. (quoting Whitfield, 939 F.2d at 1075); accord United States v. Waller, 426 F.3d 838, 846 (6th Cir. 2005); United States v. Chun Yen Chiu, 857 F. Supp. 353, 361 (D.N.J. 1993); People v. Jenkins, 997 P.2d 1044, 1097-98 (Cal. 2000); People v. Gonzalez, 667 N.E.2d 323, 326-27 (N.Y. Ct. App. 1996); Riordan v. State, 905 S.W.2d 765, 771 (Tex. App. 1995); State v. Kieffer, 577 N.W.2d 352, 359-60 (Wis. 1998).  I agree.

We have often noted that the touchstone of the Fourth Amendment is reasonableness. See, e.g., Bryant, 39 Va. App. at 471-72, 573 S.E.2d at 335; Weathers v. Commonwealth, 32 Va. App. 652, 658, 529 S.E.2d 847, 850 (2000).  Considering the heightened expectation of privacy that exists in closed containers, I believe that, when permitted by the circumstances, "reasonableness" requires officers acting under third-party consent to make reasonable attempts to resolve any apparent ambiguity in the ownership or control over any closed containers located within the place being searched.  See Rodriguez, 497 U.S. at 188-89 (holding that, when law enforcement officers obtain consent to search pursuant to apparent authority, if the "surrounding circumstances [are] such that a reasonable person would doubt [that authority exists] and not act

upon [the consent] without further inquiry, . . . *then [the] warrantless [search] without further inquiry is unlawful unless authority actually exists*" (emphasis added)).[8]  Hence, absent some affirmative indicia that the party consenting to a general search of the premises either owns or maintains joint access and control for most purposes over a closed container found within the place being searched, law enforcement officers should not proceed further without first determining that the third party has an interest in the container sufficient to vest that party with the authority to consent to its search.[9]  To hold otherwise encourages law enforcement officers to remain deliberately ignorant of whether the party consenting to the search has any interest in the closed container, thereby heightening the risk that those officers will infringe upon the Fourth Amendment rights of the absent owner.  Moreover, although I agree that there is a risk of uncertainty that a citizen's privacy will be invaded without justification, I disagree with the

---

[8] I note that this rule does not necessarily extend to all types of closed containers, but only those—like backpacks—that "historically command a high degree of privacy." Salinas-Cano, 959 F.2d at 864 (noting that "the type of container at issue is . . . an important consideration"); see also Jimeno, 500 U.S. at 253 (Marshall, J., dissenting) (describing the "heart of the Fourth Amendment" as the protection of containers that are "common repositories for one's papers and effects").

[9] The majority cites Melgar, 227 F.3d at 1041, for the proposition that a search is "permissible if the police do not have reliable information that the container is *not* under the authorizer's control."  I don't find Melgar persuasive to the extent that the majority does.  In Melgar, the police had no reason to know that the purse in question did not belong to the woman authorizing the search. Id. at 1042.  Specifically, they knew that the woman giving the consent rented the room in which the purse was found. Id.  In addition, there were no exterior markings on the purse that should have alerted them to the fact that it belonged to someone other than the woman who rented the room. Id.  Moreover, the woman who consented to the search "knew that the[] [officers] were searching for evidence of counterfeit dividend checks, which could easily fit inside the purse." Id.  Taken together, the court concluded that the scope of the consent encompassed the officer's right to look into the purse. Id.
In this case, the officers knew that Glenn occupied the room.  In fact, he stated that he slept in this particular room.  Moreover, there were men's pants on the bed, men's clothing hanging in the closet, and a backpack on the floor.  Unlike in Melgar, Glenn did not give Officer Ferguson specific consent to search the room where the container was located.  Moreover, there is no indication in the record that Glenn's grandfather, who consented to the search, knew what the officers were looking for, or that they intended to search the backpack.

- 17 -

majority as to "which way the risk of uncertainty should run."  Instead of assigning that risk to the citizen, I would assign that risk to the police officers who are not relying on probable cause or an emergency situation, but who seek to rely exclusively on a mistaken perception of who may consent to the search.[10]

In this case, although Glenn did not object to the search of his backpack, neither did he consent.  He was instructed by the officers to wait in the living room while Ferguson conducted the search of the bedrooms.  Thus, even if he had wanted to object to the search of his backpack, Glenn was not given the opportunity to identify the backpack as belonging to him until after it had been opened.[11]  And, because it was ambiguous at best as to who owned the backpack, and because both Glenn and his grandfather were mere steps away, a reasonable officer easily could, and should have made further inquiries and asked either the grandfather or Glenn for permission to search it.  See Salinas-Cano, 959 F.2d at 864.  Because Officer Ferguson failed to do so, I would hold that the search exceeded the scope of the consent, and was thus "unlawful."  Id.

The majority argues, however, that the Supreme Court's recent holding in Randolph eschews any duty to inquire.  In support of this proposition, the majority quotes language from Randolph, opining that "it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual *whose authority was apparent . . . ."*  126 S. Ct. at 1527 (emphasis added).  For the reasons discussed above, however,

---

[10] I note that in this case, the officers were perfectly willing to walk across the room to engage Glenn when it suited their purpose.  In other words, the officers did not approach Glenn to ask if they could search the backpack.  Instead, they searched the backpack and then asked if the contents belonged to him.

[11] This Court has stated that "where the defendant is present and not objecting, the police are not thereby prevented from relying on a consent to search given by a third party *with sufficient authority*."  Walls v. Commonwealth, 2 Va. App. 639, 651, 347 S.E.2d 175, 182 (1986) (emphasis added).  As in Walls, the grandfather had sufficient authority to authorize the search of the house.  However, as indicated, in my view, that consent does not extend to the backpack, and, thus, Glenn's failure to object does not automatically render the search "reasonable."

the grandfather's authority to consent to a search of the backpack was not apparent under these circumstances. The language quoted by the majority is, therefore, not applicable in this context.

Moreover, unlike this case, Randolph involved "disputed permission" by individuals who each inarguably had *actual* authority to waive Fourth Amendment protections over the place searched. As Justice Souter expressly reaffirmed in Randolph, society recognizes that a houseguest has a legitimate expectation of privacy in his host's home. See Minnesota v. Olson, 495 U.S. 91, 98 (1990). As in Olson, Glenn's status was that of a houseguest, and as in Olson, Glenn's grandfather had no authority to consent to a search of Glenn's belongings merely by virtue of their presence in the home.

In sum, although the facts of this case would "warrant a man of reasonable caution in the belief" that the grandfather "had authority over the premises," in my view, those same facts were insufficient to "warrant a man of reasonable caution in the belief" that Glenn's grandfather either owned or shared control of the backpack. Rodriguez, 497 U.S. at 188-89 (internal quotations omitted). If so, it then follows that the Commonwealth failed to prove that the grandfather possessed the apparent authority to consent to the search of the backpack. And, because an objective law enforcement officer could not have reasonably believed that the grandfather had the authority to consent to a search of the backpack, I believe that the resulting search violated the Fourth Amendment. Accordingly, I dissent from the analysis and holding of the majority, and would hold that the trial court erred in denying Glenn's motion to suppress.

II. The Appropriate Appellate Remedy

Because I would reverse the trial court on the issue of the search of the backpack and because this Court has affirmed the trial court with respect to the admissibility of Glenn's incriminating statements to the police, I must necessarily address the applicability of Code

§ 19.2-254. This statute provides that, if a defendant who enters a conditional guilty plea "prevails on appeal, he shall be allowed to withdraw his plea."

For the reasons that follow, I would hold that an appellant who partially prevails on appeal is entitled to an opportunity to withdraw his conditional guilty plea.

No Virginia appellate court has ever addressed the question of whether an appellant who partially prevails on appeal should be entitled to withdraw his conditional plea. Every other jurisdiction to have directly addressed this issue, however, has held that an appellant should be given the opportunity to withdraw his conditional guilty plea if he succeeds in excluding, on appeal, evidence that would reasonably have influenced his decision to enter a conditional plea. I agree. Accordingly, I would remand this case to give Glenn the opportunity to withdraw his conditional plea and, if he so chooses, proceed to trial.

Of the approximately thirty jurisdictions[12] that authorize some form of a conditional plea procedure, a number of them have held that a defendant who partially prevails on appeal is entitled to an opportunity to withdraw his conditional plea. For example, in State v. Juarez, 903 P.2d 241 (N.M. Ct. App. 1995), the New Mexico Court of Appeals observed that, "if improperly admitted evidence could have influenced a defendant's decision to plead guilty, there is a fair inference that the evidence contributed to the plea." Id. at 248. Thus, in situations involving a

---

[12] Jurisdictions that have adopted—either by rule, statute, or decision—a conditional plea procedure similar to that codified in Code § 19.2-254 include the following: Sawyer v. State, 456 So. 2d 110 (Ala. Crim. App. 1982); Cooksey v. State, 524 P.2d 606 (Alaska 1974); Ark. R. Crim. P. 24.3(b); Cal. Penal Code § 1237.5 & Cal. App. R. 30(b); People v. Bachofer, 85 P.3d 615, 617 (Colo. Ct. App. 2003); Conn. Gen. Stat. § 54-94a; D.C. Super. Ct. R. Crim. P. 11(a)(2); Fla. R. App. P. 9.140(b)(2)(A)(i); Haw. R. Penal P. 11(a)(2); Idaho R. Crim. P. 11(a)(2); Ky. R. Crim. P. 8.09; State v. Crosby, 338 So. 2d 584 (La. 1976); Me. R. Crim. P. 11(a)(2); People v. Reid, 362 N.W.2d 655 (Mich. 1984); Mont. Code Ann. § 46-12-204(3); Nev. Rev. Stat. § 174.035(3); N.J. R. 3:9-3(f); State v. Hodge, 882 P.2d 1 (N.M. 1994); N.Y. Crim. P. Law § 710.70; N.C. Gen. Stat. § 15A-979(b); N.D. R. Crim. P. 11(a)(2); Ore. Rev. Stat. 135.335(3); Tenn. R. Crim. P. 37(b)(2)(i); Tex. Code Crim. Proc. art 44.02 & Tex. R. App. P. 25.2(a)(2); Utah R. Crim. P. 11(i); Vt. R. Crim. P. 11(a)(2); W. Va. R. Crim. P. 11(a)(2); Wis. Stat. Ann. § 971.31(10); Wyo. R. Crim. P. 11(a)(2); see also Fed. R. Crim. P. 11(a)(2).

defendant who is "partially successful," the court concluded that it must "remand so that Defendant may have the opportunity to reassess the admissible evidence in this case and either plead guilty or proceed to trial." Id. at 249.

Similarly, in State v. Piorkowski, 672 A.2d 921 (Conn. 1995), the Connecticut Supreme Court observed that, under the applicable state statute, "there may be suppression issues that result in only partial appellate success," reasoning that "[t]he denial of a motion to suppress based on a claim of an unreasonable search and seizure" could conceivably "yield an appellate result suppressing part, but not all, of the evidence gathered as a result of the search." Id. at 930-31. The Piorkowski court concluded that, when an appellant has partially prevailed on the appeal of a conditional plea, the appropriate appellate remedy would be to remand so as to permit "both the state and the defendant . . . to reevaluate their respective positions in light of the availability of some, but not all, of the evidence gathered as a result of the search." Id. at 931 n.15; accord United States v. Tantalo, 680 F.2d 903 (2d Cir. 1982); United States v. Mejia, 69 F.3d 309, 317 n.8 (9th Cir. 1995); People v. Hill, 528 P.2d 1, 28 (Cal. 1974); State v. Dinsmore, 49 P.3d 830, 838 (Ore. Ct. App. 2002), aff'd, 87 P.3d 1120 (Ore. 2004); see also United States v. Leake, 95 F.3d 409, 420 & n.21 (6th Cir. 1996) (articulating a case-specific standard that "requires an examination of the degree of success and the probability that the excluded evidence would have had a material effect on the defendant's decision to plead guilty").

I agree with the reasoning in these decisions. There is nothing in the language of Code § 19.2-254 indicating that an appellant must prevail on appeal with respect to every issue that formed a basis for his conditional plea. To construe the language of the statute otherwise would render moot *every* conditional appeal unless the petitioner could convince a reviewing judge or panel of this Court that every issue presented to this Court had merit. Where, as here, a defendant has sought to exclude two separate bodies of evidence on different constitutional

grounds, and this Court only reverses the trial court's decision on one of those two grounds, in my view, it would be unduly harsh to punish that defendant for exercising his statutory right to appeal the denial of both motions to suppress. Holding that a defendant who "prevails in part" is not entitled to withdraw his conditional guilty plea would then have the practical effect of forcing a defendant to select just one appealable issue and waive any other constitutional objections he might have to the remaining evidence. In my view, this does not comport with either the spirit or language of Code § 19.2-254.

Accordingly, in situations where an appellant has conditionally pleaded guilty pursuant to Code § 19.2-254 and has been partially successful on appeal, I would hold that the appropriate remedy is to remand the case "so that Defendant may have the opportunity to reassess the admissible evidence in this case and either plead guilty or proceed to trial." Juarez, 903 P.2d at 249.[13] Therefore, because I would hold that Glenn has prevailed on the merits of his motion to suppress the physical evidence recovered from the backpack, I would remand this case to allow

---

[13] I note that there is no constitutional right to conditionally plead guilty and that, under Code § 19.2-254, the Commonwealth and the trial court must approve a conditional guilty plea before it may be entered. Accordingly, both the Commonwealth and the trial court share control with the defendant over any issues ultimately presented to this Court on appeal. See generally United States v. Lace, 669 F.2d 46, 53 n.5 (2d Cir. 1982) ("If a plea is tendered upon condition that more than one issue is reserved for appeal, the district court should satisfy itself that the reserved issues are significant to the outcome of the case.").

Glenn the opportunity to decide whether he "wishes to withdraw [his] plea and go to trial," or,

"in light of [his] limited success on appeal, not to withdraw it." Dinsmore, 49 P.3d at 838.[14]

---

[14] I note, as the Commonwealth argued to the panel, that some federal jurisdictions have held that a conditional guilty plea is void at its inception if the defendant attempts to reserve issues for appeal that are non-case-dispositive. See, e.g., United States v. Bundy, 392 F.3d 641, 645 (4th Cir. 2004) (citing precedent from the Second, Third, Fifth, and Seventh Circuits). These cases have their roots in the Official Comments to the Federal Rule, which suggest that a conditional plea should only reserve the right to appeal case-dispositive issues. Specifically, the Official Comment notes that requiring governmental consent for conditional pleas is appropriate because "[t]he government is in a unique position to determine whether the matter at issue would be case-dispositive, and, as a party to the litigation, should have an absolute right to refuse to consent to potentially prejudicial delay." Official Comment, Fed. R. Crim. P. 11(a)(2). See generally United States v. Wong Ching Hing, 867 F.2d 754, 758 (2d Cir. 1989) (discussing rationale behind the "dispositiveness" requirement). In contrast, the text of Code § 19.2-254 permits a defendant to "reserv[e] the right, on appeal from the judgment, to a review of the adverse determination of *any* specified pretrial motion." (Emphasis added). Because there is no "dispositiveness requirement" evident on the face of the statute itself, I would decline the Commonwealth's invitation to add one by judicial fiat. See generally State v. Montoya, 887 P.2d 857, 860 (Utah 1994) (declining to add a "dispositiveness requirement" to Rule 11(i) of the Utah Rules of Criminal Procedure, reasoning that text of the rule "allows a defendant entering a conditional plea to reserve the right to appeal 'the adverse determination of *any* specified pre-trial motion,' not just dispositive ones" (quoting Utah R. Crim. P. 11(i)) (emphasis in original))). Accordingly, I do not address whether the issues Glenn reserved for appeal might be deemed "non-case-dispositive," so as to render his conditional plea void at its inception.

# VIRGINIA:

*In the Court of Appeals of Virginia on*  **Tuesday**  *the*  **24th**  *day of*  **October, 2006**.

Keith Isiah Glenn,                                                                                      Appellant,

 against                     Record No. 2390-04-2
                            Circuit Court Nos. CR04-54-01 and CR04-54-03

Commonwealth of Virginia,                                                          Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Felton, Judges Benton, Elder, Frank, Humphreys,
Clements, Kelsey, McClanahan, Haley, Petty and Beales

On September 7, 2006 came the appellee, by the Attorney General of Virginia, and filed a petition praying that the Court set aside the judgment rendered herein on August 15, 2006, and grant a rehearing thereof.

On consideration whereof, the petition for rehearing is granted, the mandate entered herein on August 15, 2006 is stayed pending the decision of the Court, and the appeal is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is established:  Appellant shall file an opening brief upon rehearing *en banc* within 21 days of the date of entry of this order; appellee shall file an appellee's brief upon rehearing *en banc* within 14 days of the date on which the opening brief is filed; and appellant may file a reply brief upon rehearing *en banc* within 14 days of the date on which the appellee's brief is filed.  The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter. It is further ordered that the appellee shall file twelve additional copies of the

appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Humphreys and Kelsey
Argued at Richmond, Virginia


KEITH ISIAH GLENN
                                                            OPINION BY
v.        Record No. 2390-04-2                    JUDGE ROBERT J. HUMPHREYS
                                                          AUGUST 15, 2006
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF COLONIAL HEIGHTS
                          Herbert C. Gill, Jr., Judge[1]

            Kevin Purnell (Dinkin & Purnell, PLLC, on briefs), for appellant.

            Josephine F. Whalen, Assistant Attorney General (Judith W.
            Jagdmann, Attorney General; Robert F. McDonnell, Attorney
            General, on briefs), for appellee.


        Keith I. Glenn ("Glenn") appeals his convictions for robbery, in violation of Code

§ 18.2-58, and conspiracy to commit robbery, in violation of Code § 18.2-22.  On appeal, Glenn

argues that the trial court erred in denying his motion to suppress, reasoning that the police

officers, while searching his residence, obtained certain evidence in violation of his Fourth

Amendment rights.  Specifically, Glenn contends that, although his grandfather—the owner of

the premises—consented to the search of the house, that consent did not give the officers the

authority to open a closed container located in Glenn's bedroom.  For the following reasons, we

agree that, in this case, an objectively reasonable police officer would not have believed that the

grandfather's consent to search the premises also gave the officer the authority to open the closed

container.  Accordingly, we reverse Glenn's convictions and remand this case for further

proceedings.

---

[1] Judge Frederick G. Rockwell, III denied Glenn's motions to suppress.

# I. BACKGROUND

"[O]n appeal of the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth, the party prevailing below." Aldridge v. Commonwealth, 44 Va. App. 618, 638, 606 S.E.2d 539, 549 (2004). So viewed, the evidence in this case establishes the following.

In the early hours of January 4, 2004, Glenn and his cousin were driving down a road in the City of Colonial Heights when they saw "a white guy walking down the street." Glenn and his cousin decided to rob the pedestrian. The two men pulled their car "off to a side street," got out of the vehicle, approached the pedestrian, pointed a gun at him, and said, "Give me all your money." After taking the victim's cell phone and $370 in cash, they fled.

Four days later, Detective Dan Ferguson, Detective Greg Russell, and Captain Mo Williams obtained arrest warrants for Glenn and his cousin. After taking Glenn's cousin into custody, the three officers went to the address identified on the arrest warrant as Glenn's residence. When they got to the house, Glenn's mother and grandmother said that Glenn was not there, but was probably "on his way home" to his grandfather's house.

The officers then went to the home of Glenn's grandparents, where Glenn had been residing for about two months. They knocked on the front door, and Glenn answered. The officers asked Glenn "if his name was Keith Glenn," and Glenn said that it was. The officers then arrested Glenn, handcuffed him, and read him his Miranda rights.

After Glenn's arrest, the officers and Glenn "went into the house." The officers escorted Glenn to the living room, where Glenn's grandfather was "walking around." The three detectives identified themselves as police officers, "asked the grandfather if he understood, and

he shook his head yes."[2] Captain Williams then asked the grandfather if the officers could search the house. The grandfather again nodded yes. Captain Williams also asked if Glenn paid rent to stay in the home, and the grandfather shook his head no.

Detective Ferguson then began to search the house. Glenn stayed in the living room while Ferguson conducted the search. At no time did the officers ask Glenn for consent to search his rooms or their contents, nor did Glenn object to the search.

Ferguson first searched the room closest to the living room, which Glenn had indicated was the "room he slept in." In that room, Ferguson found three mattresses propped up against the wall and "various boxes of women's clothing." Having found no evidence of the crime, Ferguson left the room and looked down the hallway. Glenn then pointed down the hall and stated, "Oh yeah, I sleep in that bedroom as well."

Ferguson entered the second room and searched it. He found a pair of pants on the bed, men's clothing hanging in the closet, a cell phone lying on the closet floor, and a backpack on the bedroom floor. The backpack was closed, and Ferguson had to "manipulate it open" to see its contents. Inside the backpack, Ferguson found $45 in cash, a wallet containing Glenn's identification, and another cell phone, which matched the description of the phone stolen during the armed robbery.[3] At this point, Captain Williams "escorted" Glenn from the living room to the door of the bedroom. Glenn identified the backpack as belonging to him, and he claimed to have found the phone lying on the ground in Colonial Heights.

---

[2] As a result of "several strokes," Glenn's grandfather cannot speak.

[3] Although not discussed by the officer who performed the search, Glenn's grandmother testified that she had left one box of clothes in Glenn's bedroom. Other than the box, "[e]verything in [the room] was [Glenn's]." It is not clear from the record where that box of clothes was located, or whether the officer noticed the box before he opened the backpack.

- 3 -

Glenn was taken to the police station, where he gave a full confession, both written and verbal. A grand jury subsequently indicted Glenn for robbery, conspiracy to commit robbery, and use of a firearm in the commission of a felony. Before trial, however, Glenn filed two pretrial motions to suppress. In one motion, Glenn requested that the trial court "suppress any and all statements made by the defendant . . . to all law enforcement agencies," arguing that the statements were obtained after he invoked his right to remain silent and, thus, in violation of his Fifth Amendment rights. In the second motion, Glenn requested that the trial court suppress "all evidence obtained and/or recovered by the Commonwealth incident to his arrest at his residence on the grounds that the search is in violation of the Fourth Amendment of the Constitution of the United States, [and] Article I, Section 10 of the Constitution of Virginia . . . ."

The trial court, by written order dated June 25, 2004, denied both motions to suppress, reasoning, as pertinent to this appeal, that:

> Mr. Brooks, the defendant's grandfather and owner of the residence, consented to the search of the property without reservation or qualification. Mr. Brooks also indicated to the police that the defendant did not pay rent. The rooms that were searched were open to view and contained a mixture of personal property, which the police subsequently learned belonged to the defendant and his grandmother, Rose Brooks. The defendant was present at the search, observed the search, and took no action to countermand his grandfather's permission by advising the police that he objected to the search of that portion of the residence he later claimed he occupied.

After the trial court denied the motions to suppress, Glenn entered a conditional guilty plea to the counts of robbery and conspiracy to commit robbery.[4] Glenn then filed a petition for appeal to this Court, assigning as error both that the trial court erred in denying the motion to suppress the physical evidence recovered during the search of the residence and that the trial

_____
[4] The trial court granted the Commonwealth's motion to *nolle prosequi* the remaining charge of use of a firearm in the commission of a felony.

- 4 -

court erred in denying the motion to suppress his statements to the police. This Court granted the petition for appeal as to the motion to suppress the physical evidence, and denied the petition for appeal as to the motion to suppress Glenn's statements to the police. Thus, the sole issue presented on appeal is whether the trial court erred in denying Glenn's motion to suppress the physical evidence found in Glenn's bedroom.

## II. MERITS OF THE APPEAL

When reviewing a trial court's denial of a motion to suppress, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). "However, we consider *de novo* whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment." Shaver v. Commonwealth, 30 Va. App. 789, 794-95, 520 S.E.2d 393, 396 (1999).

Under the circumstances of this case, we must consider two separate, but related, questions. First, we must decide whether the grandfather's consent authorized the police officers to search Glenn's bedroom. Second, we must also consider whether the grandfather's consent authorized the police officers to open Glenn's backpack. For the reasons that follow, we hold that, although the grandfather's consent to search the bedroom was valid, that consent did not authorize the officers to open a closed container found in that bedroom. Accordingly, we hold that the trial court erred in denying the motion to suppress.

### A. Validity of the Third-Party Consent as to the Bedroom

The Fourth Amendment protects "the right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, although the Fourth Amendment "ordinarily prohibit[s] the warrantless entry of a

- 5 -

person's house as unreasonable *per se*, one 'jealously and carefully drawn' exception recognizes the validity of searches [conducted pursuant to] the voluntary consent of an individual possessing authority" to give that consent. Georgia v. Randolph, 126 S. Ct. 1515, 1520 (2006) (quoting Jones v. United States, 357 U.S. 493, 499 (1958)) (citations omitted).[5] Individuals who possess the authority to consent to the search of a premises include "a fellow occupant who shares common authority over property." Id. (citing United States v. Matlock, 415 U.S. 164, 170 (1974)). Similarly, "the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)); see also Bryant v. Commonwealth, 39 Va. App. 465, 470-72, 573 S.E.2d 332, 335 (2002); Jones v. Commonwealth, 16 Va. App. 725, 727-28, 432 S.E.2d 517, 519 (1993); Caldwell v. Commonwealth, 15 Va. App. 540, 542, 425 S.E.2d 534, 535 (1993).

In this case, Glenn's grandfather—the owner of the premises—gave the officers his consent to search the house. Glenn, although present, did not expressly object to that search. Cf. Randolph, 126 S. Ct. at 1528. Also, there was no evidence that Glenn's grandfather lacked the authority or ability to enter Glenn's bedroom whenever he wished. For example, there was no landlord-tenant relationship between Glenn and his grandparents, cf. Stoner v. California, 376 U.S. 483, 489-90 (1964); Chapman v. United States, 365 U.S. 610 (1961); United States v. DiPrima, 472 F.2d 550, 551 (1st Cir. 1973), and Glenn's bedroom did not have a separate key, padlock, or other device restricting access to the room. In fact, Glenn's grandmother testified that she could "go in and out of [the bedroom] anytime [she] want[ed]."

---

[5] The decision in Randolph was handed down following oral arguments in this case. Accordingly, this Court asked the parties to submit additional briefs addressing the possible impact of the Randolph decision on the resolution of this appeal.

From these facts, it follows that the grandfather "shar[ed] common authority" over the bedroom and, thus, possessed the actual authority to consent to a search of that room. Thus, the general search of the premises, including the bedroom, did not violate Glenn's Fourth Amendment rights. See Matlock, 415 U.S. at 171 ("Permission to search [may be] obtained from a third party who possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected.").

B.  Validity of the Third-Party Consent as to the Backpack

However, we must also decide whether the grandfather's consent to the search of his home also vested the officers with the authority to open Glenn's backpack. See Randolph, 126 S. Ct. at 1522 (noting, for example, that, "when it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on the premises as an occupant may lack any perceived authority to consent"); United States v. Karo, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring) (stating that when a third party gives consent to search a room, that person is not necessarily consenting to a search of the closed containers within the room). For the following reasons, we hold that it did not.

An individual claiming Fourth Amendment protection must demonstrate a "legitimate expectation of privacy in the invaded place," and it must be one which "society recognizes as reasonable." Minnesota v. Olson, 495 U.S. 91, 95-96 (1990) (citations omitted). Clearly, "an individual has a heightened expectation of privacy in the contents of a closed container." Florida v. Jimeno, 500 U.S. 248, 253 (1991) (Marshall, J., dissenting); see also United States v. Chadwick, 433 U.S. 1, 13 (1977) ("[A] person's expectations of privacy in personal luggage are substantially greater than in an automobile."). "Luggage, handbags, paper bags, and other containers are common repositories for one's papers and effects, and the protection of these items from state intrusion lies at the heart of the Fourth Amendment." Jimeno, 500 U.S. at 253

- 7 -

(Marshall, J., dissenting); see U.S. Const. amend. IV ("The right of the people to be secure in their . . . papers, and effects, against unreasonable searches and seizures, shall not be violated.").

However, it is also clear that a third party, with standing to do so, may validly consent to the search of a closed container, even though the actual owner of the container has a heightened expectation of privacy in its contents. See, e.g., Frazier v. Cupp, 394 U.S. 731, 740 (1969) (cousin had authority to consent to search of the defendant's duffel bag, which both men used and which had been left in the cousin's home); United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997) (holding that a mother could consent to a search of her adult son's bedroom, including a closed duffle bag stored in between the mattresses on the bed); United States v. Richardson, 562 F.2d 476 (7th Cir. 1977) (holding that a woman can consent to a search of a bedroom, shared by herself and the man she lived with, including the closet). But consent to search a private container is only effective if given by someone "with common authority over or other sufficient relationship to the . . . effects sought to be inspected." Matlock, 415 U.S. at 171. Common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes." Id. at 171 n.7.

The burden of proving the effectiveness of a third party's consent rests with the government. United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992) (citing Rodriguez, 497 U.S. 177). The government can meet this burden by (1) coming "forward with persuasive evidence of both shared use and joint access to or control over a searched area, which would demonstrate actual authority to consent," (2) "show[ing] that the owner of the property to be searched has expressly authorized a third party to give consent to the search," or (3) "establish[ing] consent by means of the apparent authority doctrine." United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993) (internal citations omitted).

- 8 -

In this case, there is no evidence to suggest that the grandfather possessed the *actual* authority to consent to a search of the backpack. Specifically, the Commonwealth presented no evidence—much less "persuasive" evidence—from which it could be inferred that the grandfather owned, used, or was able to freely access either the backpack or its contents. See id. Indeed, Glenn's grandmother testified that neither she nor Glenn's grandfather ever used the backpack. It follows that the Commonwealth failed to prove that the grandfather possessed the actual authority to consent to a search of the backpack.

Nor did the Commonwealth present any evidence indicating that Glenn had given his grandfather express authorization to consent to a search of the backpack. See id. Accordingly, the only remaining issue is whether the Commonwealth established that the grandfather had the *apparent* authority to consent to a search of the backpack. Id.

When determining whether an individual possesses apparent authority to consent to a search, the relevant inquiry is whether, under the totality of the circumstances, an objectively reasonable officer would "conclude that the person providing consent had the requisite authority to do so." Bryant, 39 Va. App. at 471, 573 S.E.2d at 335. To establish that a third party has the apparent authority to consent to the search of a closed container, the Commonwealth must prove that an objectively reasonable police officer would have believed that the third party had "joint access or control" of that container. Matlock, 415 U.S. at 171 n.1 (noting that authority to consent "rests on mutual use of the property by persons generally having joint access or control" of the item or area being searched). This determination must be judged by the facts available to the officer at the moment the officer conducted the search. See Rodriguez, 497 U.S. at 185-86. Accordingly, if the facts, as the officer reasonably believed them to be, would have justified an objectively reasonable belief that the third party either owned or maintained some level of control over a closed container found within the area being searched, the resulting search of that

closed container does not violate the Fourth Amendment.  United States v. Whitfield, 939 F.2d

1071, 1075 (D.C. Cir. 1991); see also United States v. Basinski, 226 F.3d 829, 834 (7th Cir.

2000) ("[A]pparent authority turns on the government's knowledge of the third party's use of,

control over, and access to the container to be searched, because these characteristics are

particularly probative of whether the individual has authority over the property.").[6]

Here, then, considering the totality of the circumstances, we must determine whether an

objective police officer could have reasonably believed that the grandfather used, controlled, or

had unrestricted access to the backpack and its contents.  For the reasons that follow, we hold

that the Commonwealth failed to prove that an objectively reasonable police officer would have

believed that the grandfather had control over, or joint access to, the backpack.[7]  And, because

[6] Some courts have held that the relationship between the consenting party and the owner of the item searched should be a factor in determining whether the third-party consent is valid. See, e.g., Colbert v. Commonwealth, 43 S.W.3d 777 (Ky. 2001); see also People v. Lucero, 720 P.2d 604 (Colo. Ct. App. 1985) (no evidence that mother relinquished control of room, despite having her own reasons for never entering it); People v. Brooks, 660 N.E.2d 270 (Ill. App. Ct. 1996) (no evidence that room was locked or that son had left instructions not to enter it); People v. Goforth, 564 N.W.2d 526 (Mich. Ct. App. 1997) (although son was 18 years old and paid rent, nothing indicated that mother lacked access to the room); State v. Cole, 706 S.W.2d 917 (Mo. Ct. App. 1986) (a person living with his family can expect more intrusion than an independent renter living with non-relatives).  However, these courts have found that the consent is valid because of the consenting party's "superior right in the home," Colbert 43 S.W.3d at 777, and that the consent is sufficient even when the defendant is present, id.; see also Gray v. Commonwealth, 249 S.W. 769 (Ky. 1923).  Because this justification directly contradicts the definition of "common authority" as set forth in Randolph and Matlock, we decline to adopt a similar approach.  See Randolph, 126 S. Ct. at 1521 (noting that, although the issue of reasonableness may be "influenced by the law of property," it is "not controlled by its rules"); Matlock, 415 U.S. at 171 n.7 (noting that "[c]ommon authority is, of course, not to be implied from the mere property interests a third party has in the property," because "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes" (citations omitted)).

[7] The dissent notes that "[t]he 'presence of consent' presents 'a factual question.' Hargraves v. Commonwealth, 37 Va. App. 299, 307, 557 S.E.2d 737, 741 (2002) (citing Bynum v. Commonwealth, 23 Va. App. 412, 418, 477 S.E.2d 750, 753 (1996))."  However, although consent is a factual question, the ultimate question of whether the officer's search was reasonable under the circumstances is one of law that we review de novo on appeal.  See Kyer v.

the grandfather therefore lacked the apparent authority to consent, the resulting search of the backpack and its contents violated Glenn's Fourth Amendment rights.

The record, when viewed in the light most favorable to the Commonwealth, establishes that Glenn lived with his grandparents, but did not have exclusive control over the rooms searched. Specifically, Glenn's grandmother could go in and out of the rooms and, in fact, kept a box of her personal belongings in Glenn's bedroom. Also, Glenn had a key to the house, but neither room he claimed as "his" had a separate key belonging solely to him. Thus, as discussed above, the officers could have formulated an objectively reasonable belief that the grandfather had the authority to consent to a search of Glenn's bedroom.

However, the record also establishes that Ferguson focused his search on the rooms identified by Glenn as those he "slept in." When Ferguson entered the second bedroom, he saw a pair of pants lying across the bed. Glenn's clothes were hanging in the closet. The only item in the room not belonging to Glenn was a box of clothes that the officer may or may not have seen before he opened the backpack.

Also, the backpack itself was closed, although not locked or otherwise sealed shut. Cf. United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978) (although mother could consent to search of house, she could not consent to search of locked footlocker found in her son's room). And, although there is no evidence suggesting the backpack was tucked under the mattress or otherwise hidden from view, cf. Commonwealth v. Sardone, 10 Mass. L. Rep. 97 (Super. Ct. 1999) (mother could not consent to the search of her son's knapsack that was at least partially

Commonwealth, 45 Va. App. 473, 479, 612 S.E.2d 213, 217 (2005) (*en banc*) (noting that, although this Court "must give 'deference to the factual findings of the trial court,'" we "'independently determine' whether those findings satisfy the requirements of the Fourth Amendment" (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003))).

under the foot of the bed in an area not visible from the door), there were no marks or tags on the backpack that would indicate its ownership.

From these facts, the question of whether the grandfather owned, used, or otherwise controlled the backpack was ambiguous, at best. And, although the backpack was located inside the grandfather's home, "[f]or purposes of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents." Basinski, 226 F.3d at 834; see also Salinas-Cano, 959 F.2d at 866 ("To hold that an officer may reasonably find authority to consent solely on the basis of the presence of a [container] in the home of another would render meaningless the Fourth Amendment's protection of such [containers]. Given awareness by the police officers of the ambiguities present here with respect to the apparent ownership of the backpack, we hold that the police could not infer such authority merely from [the consenter's] ownership of the house." (internal quotations omitted) (third alteration in original)); State v. Tonroy, 92 P.3d 1116, 1120 (Kan. Ct. App. 2004) ("[C]onsent by an owner or tenant of a residence does not necessarily give the police consent to search closed containers within the residence that belong to others.").[8]

Moreover, although not clearly addressed by the Supreme Court of the United States, many lower courts have held that the burden of proving apparent authority "cannot be met if [law enforcement] agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." Salinas-Cano, 959 F.2d at 864. Thus, if the officers "do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual

---

[8] The dissent bases its analysis on the initial conclusion that the record indicates that "[n]o circumstances suggested to the police that Glenn had preserved a private enclave within the home or had somehow undermined the grandfather's authority over all areas of his own home." In our view, the record provides no support for this conclusion and indeed reflects very clearly that the only rooms singled out to be searched were those which Glenn indicated he occupied and indeed the only reasonable inference supported by the record is that the backpack was searched specifically because the police officers suspected it belonged to Glenn.

use' by the person giving consent, 'then [a] warrantless [search] is unlawful without further inquiry.'" Id. (quoting Whitfield, 939 F.2d at 1075); accord United States v. Waller, 426 F.3d 838, 846 (6th Cir. 2005); United States v. Chun Yen Chiu, 857 F. Supp. 353, 361 (D.N.J. 1993); People v. Jenkins, 997 P.2d 1044, 1093-94 (Cal. 2000); People v. Gonzalez, 667 N.E.2d 323, 326-27 (N.Y. Ct. App. 1996); Riordan v. State, 905 S.W.2d 765, 771 (Tex. App. 1995); State v. Kieffer, 577 N.W.2d 352, 359-60 (Wis. 1998). We agree.

We have often noted that the touchstone of the Fourth Amendment is reasonableness. See, e.g., Bryant, 39 Va. App. at 471-72, 573 S.E.2d at 335; Weathers v. Commonwealth, 32 Va. App. 652, 658, 529 S.E.2d 847, 850 (2000). Considering the heightened expectation of privacy that exists in closed containers, we believe that, when permitted by the circumstances, "reasonableness" requires officers acting under third-party consent to make reasonable attempts to resolve any apparent ambiguity in the ownership or control over closed containers located within the place being searched. See Rodriguez, 497 U.S. at 188-89 (holding that, when law enforcement officers obtain consent to search pursuant to apparent authority, if the "surrounding circumstances could conceivably be such that a reasonable person would doubt [that authority exists] and not act upon [the consent] without further inquiry, . . . *then [the] warrantless [search] without further inquiry is unlawful unless authority actually exists*" (emphasis added)).[9] Hence, absent some affirmative indicia that the party consenting to a general search of the premises either owns or maintains some level of control over a closed container found within the place being searched, law enforcement officers should not proceed further without first determining

---

[9] We note that this rule does not necessarily extend to all types of closed containers, but only those—like backpacks—that "historically command a high degree of privacy." Salinas-Cano, 959 F.2d at 864 (noting that "the type of container at issue is . . . an important consideration"); see also Jimeno, 500 U.S. at 253 (Marshall, J., dissenting) (describing the "heart of the Fourth Amendment" as the protection of containers that are "common repositories for one's papers and effects").

that the third party has an interest in the container sufficient to vest that party with the authority to consent to its search. To hold otherwise would encourage law enforcement officers to remain deliberately ignorant of whether the party consenting to the search has any interest in the closed container, thereby heightening the risk that those officers will infringe upon the Fourth Amendment rights of the absent owner.

In this case, although Glenn did not object to the search of his backpack, neither did he consent. He was instructed by the officers to wait in the living room while Ferguson conducted the search of the bedrooms. Thus, even if he had wanted to object to the search of his backpack, Glenn was not given the opportunity to identify the backpack as belonging to him until after it had been opened.[10] And, because it was ambiguous at best as to who owned the backpack, and because both Glenn and his grandfather were mere steps away, a reasonable officer should have made further inquiries and asked either the grandfather or Glenn for permission to search it. See Salinas-Cano, 959 F.2d at 864. Because the officer failed to do so, we hold that the search was "unlawful." Id.

In sum, although the facts of this case would "warrant a man of reasonable caution in the belief" that the grandfather "had authority over the premises," those same facts were insufficient to "warrant a man of reasonable caution in the belief" that the grandfather either owned or shared control of the backpack. Rodriguez, 497 U.S. at 188-89 (internal quotations omitted).[11] It

---

[10] This Court has stated that "where the defendant is present and not objecting, the police are not thereby prevented from relying on a consent to search given by a third party *with sufficient authority*." Walls v. Commonwealth, 2 Va. App. 639, 651, 347 S.E.2d 175, 182 (1986) (emphasis added). As in Walls, the grandfather had sufficient authority to authorize the search of the house. However, as indicated, that consent does not extend to the backpack, and, thus, Glenn's failure to object does not automatically render the search "reasonable."

[11] The dissent argues, however, that the Supreme Court's recent holding in Randolph "eschews the duty-to-inquire thesis advocated by Glenn . . . ." The dissent quotes language from Randolph opining that "it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual *whose authority was*

- 14 -

follows that the Commonwealth failed to prove that the grandfather possessed the apparent

authority to consent to the search of the backpack. And, because an objective law enforcement

officer could not have reasonably believed that the grandfather had the authority to consent to a

search of the backpack, the resulting search violated the Fourth Amendment. Accordingly, we

hold that the trial court erred in denying Glenn's motion to suppress.

### III. APPROPRIATE APPELLATE REMEDY

Code § 19.2-254 provides that, if a defendant who enters a conditional guilty plea

"prevails on appeal, he shall be allowed to withdraw his plea." Here, as discussed above, this

Court partially denied Glenn's petition for appeal, thereby raising the question of whether Glenn

should be allowed the opportunity to withdraw his conditional plea even though he only

prevailed on appeal with respect to one of the two issues forming the basis for his plea.

Accordingly, following oral arguments, this Court asked for additional briefing on the following

question:

> What effect, if any, does the partial denial of Appellant's petition
> for appeal have on this Court's application of Code § 19.2-254,
> which provides that a defendant who enters a conditional guilty
> plea "shall be allowed to withdraw his plea" if he "prevails on
> appeal," or upon the Court's application of harmless error
> principles under Code § 8.01-678?

For the reasons that follow, we hold that an appellant who partially prevails on appeal is

entitled to an opportunity to withdraw his conditional guilty plea. We further hold that the

harmless error doctrine is inapplicable in the context of an appeal from a conditional guilty plea,

and, therefore, we do not address whether the remaining evidence in the case—specifically,

---

*apparent* . . . ." 126 S. Ct. at 1527 (emphasis added). For the reasons discussed above, however, the grandfather's authority to consent to a search of the backpack was *not* apparent under these circumstances. The language quoted by the dissent is, therefore, not applicable in this context.

- 15 -

Glenn's oral and written confessions—provides such overwhelming evidence of guilt as to render the trial court's error harmless beyond a reasonable doubt.

## A. Whether an Appellant Who "Partially Prevails" on Appeal Is Entitled to Withdraw His Conditional Plea

No Virginia appellate court has ever addressed the question of whether an appellant who partially prevails on appeal should be entitled to withdraw his conditional plea. Every other jurisdiction to have directly addressed this issue, however, has held that an appellant should be given the opportunity to withdraw his conditional guilty plea if he succeeds in excluding, on appeal, evidence that would reasonably have influenced his decision to enter a conditional plea. We agree. Accordingly, we remand this case to give Glenn the opportunity to withdraw his conditional plea and, if he so chooses, proceed to trial.

Of the approximately thirty jurisdictions[12] that authorize some form of a conditional plea procedure, at least four have held that a defendant who partially prevails on appeal is entitled to

---

[12] Jurisdictions that have adopted—either by rule, statute, or decision—a conditional plea procedure similar to that codified in Code § 19.2-254 include the following: Sawyer v. State, 456 So. 2d 110 (Ala. Crim. App. 1982); Cooksey v. State, 524 P.2d 606 (Alaska 1974); Ark. R. Crim. P. 24.3(b); Cal. Penal Code § 1237.5 & Cal. App. R. 30(b); People v. Bachofer, 85 P.3d 615, 617 (Colo. Ct. App. 2003); Conn. Gen. Stat. § 54-94a; D.C. Super. Ct. R. Crim. P. 11(a)(2); Fla. R. App. P. 9.140(b)(2)(A)(i); Haw. R. Penal P. 11(a)(2); Idaho R. Crim. P. 11(a)(2); Ky. R. Crim. P. 8.09; State v. Crosby, 338 So. 2d 584 (La. 1976); Me. R. Crim. P. 11(a)(2); People v. Reid, 362 N.W.2d 655 (Mich. 1984); Mont. Code Ann. § 46-12-204(3); Nev. Rev. Stat. § 174.035(3); N.J. R. 3:9-3(f); State v. Hodge, 882 P.2d 1 (N.M. 1994); N.Y. Crim. P. Law § 710.70; N.C. Gen. Stat. § 15A-979(b); N.D. R. Crim. P. 11(a)(2); Ore. Rev. Stat. 135.335(3); Tenn. R. Crim. P. 37(b)(2)(i); Tex. Code Crim. Proc. art 44.02 & Tex. R. App. P. 25.2(a)(2); Utah R. Crim. P. 11(i); Vt. R. Crim. P. 11(a)(2); W. Va. R. Crim. P. 11(a)(2); Wis. Stat. Ann. § 971.31(10); Wyo. R. Crim. P. 11(a)(2); see also Fed. R. Crim. P. 11(a)(2).

For jurisdictions that have expressly declined to adopt a conditional plea practice in the absence of an applicable statute or rule, see State v. Arnsberg, 553 P.2d 238, 240 (Ariz. Ct. App. 1976); Hooten v. State, 442 S.E.2d 836 (Ga. Ct. App. 1994); People v. Gonzalez, 730 N.E.2d 534, 545 (Ill. App. Ct. 2000); State v. Tobin, 333 N.W.2d 842, 844-45 (Iowa 1983); Bruno v. State, 632 A.2d 1192 (Md. 1993); Commonwealth v. Snyder, 427 N.E.2d 500 (Mass. 1981); State v. Lothenbach, 296 N.W.2d 854, 857-58 (Minn. 1980); State v. Parkhurst, 435 A.2d 522 (N.H. 1981); Tabor v. Maxwell, 194 N.E.2d 856 (Ohio 1963); Commonwealth v. Bartley, 8 Pa. D&C 4th 605, 609 (Pa. Comm. Pleas Ct. 1991); State v. Soares, 633 A.2d 1356, 1356 (R.I. 1993); State v. Downs, 604 S.E.2d 377 (S.C. 2004); see also Lineberry v. State, 747 N.E.2d 1151

an opportunity to withdraw his conditional plea. For example, in <u>State v. Juarez</u>, 903 P.2d 241

(N.M. Ct. App. 1995), the New Mexico Court of Appeals observed that, "if improperly admitted

evidence could have influenced a defendant's decision to plead guilty, there is a fair inference

that the evidence contributed to the plea." <u>Id.</u> at 248. Thus, in situations involving a defendant

who is "partially successful," the court concluded that it must "remand so that Defendant may

have the opportunity to reassess the admissible evidence in this case and either plead guilty or

proceed to trial." <u>Id.</u> at 249.

Similarly, in <u>State v. Piorkowski</u>, 672 A.2d 921 (Conn. 1995), the Connecticut Supreme

Court observed that, under the applicable state statute, "there may be suppression issues that

result in only partial appellate success," reasoning that "[t]he denial of a motion to suppress

based on a claim of an unreasonable search and seizure" could conceivably "yield an appellate

result suppressing part, but not all, of the evidence gathered as a result of the search." <u>Id.</u> at

930-31. The <u>Piorkowski</u> court concluded that, when an appellant has partially prevailed on the

appeal of a conditional plea, the appropriate appellate remedy would be to remand so as to

permit "both the state and the defendant . . . to reevaluate their respective positions in light of the

availability of some, but not all, of the evidence gathered as a result of the search." <u>Id.</u> at 931

n.15; <u>accord</u> <u>United States v. Tantalo</u>, 680 F.2d 903 (2d Cir. 1982); <u>United States v. Mejia</u>, 69

F.3d 309, 317 n.8 (9th Cir. 1995); <u>People v. Hill</u>, 528 P.2d 1, 28 (Cal. 1974); <u>State v. Dinsmore</u>,

49 P.3d 830, 838 (Ore. Ct. App. 2002), <u>aff'd</u>, 87 P.3d 1120 (Ore. 2004); <u>see also</u> <u>United States v.</u>

<u>Leake</u>, 95 F.3d 409, 420 & n.21 (6th Cir. 1996) (articulating a case-specific standard that

---

(Ind. Ct. App. 2001) (vacating a guilty plea entered after the prosecutor and the trial court erroneously assured the defendant that he could appeal the denial of his pretrial motion to suppress, reasoning that those assurances made the guilty plea involuntary).

"requires an examination of the degree of success and the probability that the excluded evidence would have had a material effect on the defendant's decision to plead guilty").

We agree with the reasoning in these decisions. There is nothing in the language of Code § 19.2-254 indicating that an appellant must prevail on appeal with respect to every issue that formed a basis for his conditional plea. Where, as here, a defendant has sought to exclude two separate bodies of evidence on different constitutional grounds, and this Court only reverses the trial court's decision on one of those two grounds, it would be unduly harsh to punish that defendant for exercising his statutory right to appeal the denial of both motions to suppress. Holding that a defendant who "prevails in part" is not entitled to withdraw his conditional guilty plea would then have the practical effect of forcing a defendant to select just one appealable issue and waive any other constitutional objections he might have to the remaining evidence. This does not comport with either the spirit or language of Code § 19.2-254.

Accordingly, in situations where an appellant has conditionally pleaded guilty pursuant to Code § 19.2-254 and has been partially successful on appeal, we hold that the appropriate remedy is to remand the case "so that Defendant may have the opportunity to reassess the admissible evidence in this case and either plead guilty or proceed to trial." Juarez, 903 P.2d at 249.[13] Because Glenn has prevailed on the merits of his motion to suppress the physical evidence recovered from the backpack, and because, for the reasons discussed in Part III(B), *supra*, application of the harmless error doctrine would be inappropriate, we remand this case to

---

[13] We note that there is no constitutional right to conditionally plead guilty and that, under Code § 19.2-254, the Commonwealth and the trial court must approve a conditional guilty plea before it may be entered. Accordingly, both the Commonwealth and the trial court share control with the defendant over any issues ultimately presented to this Court on appeal. See generally United States v. Lace, 669 F.2d 46, 53 n.5 (2d Cir. 1982) ("If a plea is tendered upon condition that more than one issue is reserved for appeal, the district court should satisfy itself that the reserved issues are significant to the outcome of the case.").

allow Glenn the opportunity to decide whether he "wishes to withdraw [his] plea and go to trial," or, "in light of [his] limited success on appeal, not to withdraw it." Dinsmore, 49 P.3d at 838.[14]

B.  Applicability of the Harmless Error Doctrine

The Commonwealth argues, however, that Glenn has not "prevailed" on appeal, reasoning that the remaining evidence in the case—specifically, Glenn's statements to the police—would be sufficient, standing alone, to support his conviction.  Because "Glenn may no longer prevail even if the suppression motion as to the search of his home was erroneously denied," the Commonwealth concludes that the trial court's error "was harmless."  We disagree.

No Virginia appellate decision has ever addressed the question of whether the harmless error doctrine is applicable in the context of an appeal from a conditional guilty plea.  We note, however, that, of the jurisdictions that have adopted some form of a conditional plea procedure, the overwhelming majority has declined to apply a harmless error analysis in cases involving a

---

[14] We note, as the Commonwealth argues, that some federal jurisdictions have held that a conditional guilty plea is void at its inception if the defendant attempts to reserve issues for appeal that are non-case-dispositive.  See, e.g., United States v. Bundy, 392 F.3d 641, 645 (4th Cir. 2004) (citing precedent from the Second, Third, Fifth, and Seventh Circuits).  These cases have their roots in the Official Comments to the Federal Rule, which suggest that a conditional plea should only reserve the right to appeal case-dispositive issues.  Specifically, the Official Comment notes that requiring governmental consent for conditional pleas is appropriate because "[t]he government is in a unique position to determine whether the matter at issue would be case-dispositive, and, as a party to the litigation, should have an absolute right to refuse to consent to potentially prejudicial delay." Official Comment, Fed. R. Crim. P. 11(a)(2).  See generally United States v. Wong Ching Hing, 867 F.2d 754, 758 (2d Cir. 1989) (discussing rationale behind the "dispositiveness" requirement).  In contrast, the text of Code § 19.2-254 permits a defendant to "reserv[e] the right, on appeal from the judgment, to a review of the adverse determination of *any* specified pretrial motion."  (Emphasis added).  Because there is no "dispositiveness requirement" evident on the face of the statute itself, we decline the Commonwealth's invitation to add one by judicial fiat.  See generally State v. Montoya, 887 P.2d 857, 860 (Utah 1994) (declining to add a "dispositiveness requirement" to Rule 11(i) of the Utah Rules of Criminal Procedure, reasoning that text of the rule "allows a defendant entering a conditional plea to reserve the right to appeal 'the adverse determination of *any* specified pre-trial motion,' not just dispositive ones" (quoting Utah R. Crim. P. 11(i)) (emphasis in original))).  Accordingly, we do not address whether the issues Glenn reserved for appeal might be deemed "non-case-dispositive," so as to render his conditional plea void at its inception.

conditional guilty plea.  The two cases that are generally considered the most authoritative in this respect are People v. Grant, 380 N.E.2d 257 (N.Y. 1978), and People v. Hill, 528 P.2d 1, 28 (Cal. 1974), overruled in part on other grounds by People v. DeVaughn, 558 P.2d 872 (Cal. 1977).

In Grant, the New York Court of Appeals held that the trial court improperly denied the defendant's motion to suppress his confession.  Although the state urged the court to affirm based on a harmless error analysis, the court vacated the conditional guilty plea and remanded for further proceedings.  In rejecting the state's request to apply a harmless error analysis, the Grant court observed that, "[b]ecause harmless error rules were formulated to review trial verdicts, they are difficult to apply to guilty pleas."  380 N.E.2d at 264.  The court reasoned that, "[w]ithout a trial there will be little if any evidence in the record, apart from the proof which should have been excluded," and, "without a verdict, there is no predicate for determining what causal effect the error had or might have had upon the fact finder."  Id.  The Grant court therefore held that the appropriate inquiry should be "whether there is a reasonable possibility that the error contributed to the plea."  Id.  Because "[t]his question [] is one which an appellate court is rarely equipped to answer without resorting to speculation," the court concluded that it was required to remand the case for further proceedings.  Id.

Similarly, in Hill, the California Supreme Court remanded to permit withdrawal of the defendants' conditional guilty pleas even though the "bulk of the evidence which defendants sought to suppress would indeed be admissible if they were to be tried."  528 P.2d at 28.  There, the court reasoned that "[t]he harmless error concept as a basis for according relief in such a setting is clearly inappropriate" because "[t]here simply is no intelligent means of assessing the impact of a particular erroneous refusal to suppress evidence."  Id. at 29.  The Hill court observed that, "[u]nlike the ordinary post-trial appeal, there is nothing at all in the record to indicate what evidence or defenses the defendant is capable of producing on his own behalf."  Id.

Moreover, "[t]he strategic considerations which lead an accused to plead guilty pursuant to a plea bargain will frequently hinge not only on the quantum and quality of the prosecution's evidence, but also on the probable effectiveness of the defenses and evidence which the defendant has to counterbalance the incriminating evidence." Id. Thus, although, "[a]fter the exclusion of certain items of evidence, the prosecution's case may continue to appear invulnerable to an appellate court," the defendant "may have or believe he has means of impeaching, discrediting or casting doubt on such evidence, and the items excluded on appeal might be the very ones which posed the most difficult strategic problems for the defendant." Id. Because "[o]nly the accused and his counsel are aware of what favorable evidence is available to them," the Hill court reasoned that it could not, "with any assurance, conclude that an appellate court, which does not have the benefit of that knowledge, can consistently arrive at an accurate assessment of whether the defendant would again plead guilty after knowledge that some but not all of the challenged evidence is to be suppressed." Id. "To the contrary, an unacceptable degree of appellate speculation would necessarily inject itself into the application of the harmless error concept in such a context." Id.

For these reasons, the Hill court concluded that, "[i]n view of the magnitude of the consequences of a guilty plea and the lack of an adequate basis upon which an appellate court can evaluate the impact of a trial court's error, . . . the doctrine of harmless error is inapplicable in the context of an appeal under [California's conditional guilty plea statute]." Id. at 29. Thus, "[t]he accused must be afforded an opportunity to personally elect whether, contrary to the trial court's ruling, the suppression of certain items of evidence would alter the situation in a

sufficiently favorable manner so as to render a plea of not guilty strategically preferable." Id. at 29-30. [15]

Virtually without exception,[16] every subsequent appellate decision expressly addressing the issue has held that the harmless error doctrine is inapplicable in the context of an appeal from a conditional guilty plea. See, e.g., United States v. Weber, 668 F.2d 552 (1st Cir. 1981); Jones v. Wisconsin, 562 F.2d 440 (7th Cir. 1977); Juarez, 903 P.2d at 249; Dinsmore, 49 P.3d at 838; State v. Monahan, 251 N.W.2d 421, 426 (Wis. 1977);[17] see also Official Comment, Fed. R.

_____

[15] The dissent argues that, unlike the circumstances presented in Hill and Grant, this Court does have a sufficient record from which to conduct a harmless error analysis—specifically, the proffer tendered by the parties prior to entry of the final order of conviction. This argument, however, overlooks the fact that the appropriate inquiry on appeal from a conditional plea is not whether there is sufficient evidence to support the conviction, but rather, "whether there is a reasonable possibility that the error contributed to the *plea*." Grant, 380 N.E.2d at 264 (emphasis added). Thus, unless it is clear from the record *why* the defendant decided to enter a conditional guilty plea, the strength of the remaining, unsuppressed evidence does not resolve the question of whether "the defendant would again plead guilty after knowledge that some but not all of the challenged evidence is to be suppressed." Hill, 528 P.2d at 29; see also Haring v. Prosise, 462 U.S. 306, 318 (1983) (noting that "a defendant's decision to plead guilty may have any number of [] motivations").

[16] We acknowledge that, in one recent opinion, the Tenth Circuit seemingly implied that it was using a harmless error analysis in a case involving a conditional guilty plea. See United States v. Rivera-Nearez, 418 F.3d 1104 (10th Cir. 2005). In that case, the Tenth Circuit affirmed the district court's denial of a motion to dismiss an indictment because, although the district court erred in its interpretation of the federal statute, the defendant failed, as a matter of law, to meet the statutory requirements for a collateral attack on his conviction. Because the district court reached the appropriate resolution, although for the wrong reason, the Tenth Circuit concluded that the denial of the motion to dismiss was "harmless." See id. at 1111. The Rivera-Nearez case did not, then, apply the harmless error doctrine in its traditional sense, which would have required holding that the lower court erred in excluding certain evidence but, in light of the sufficiency of the unchallenged evidence, that the error was harmless. Rather, the case merely held that the "right result, wrong reason" rule is applicable in the context of a conditional plea. See id.

[17] The dissent contends, in a footnote, that Monahan is unpersuasive because its holding has been limited by subsequent cases from its own jurisdiction. See State v. Armstrong, 591 N.W.2d 604, 604 (Wis. 1999) (*per curiam*). We note that the order cited by the dissent in support of this proposition did not involve an appeal of a conditional guilty plea, but rather, the appeal of a plea agreement. See State v. Armstrong, 588 N.W.2d 606, 608 (Wis. 1999) ("Armstrong entered into a *plea agreement* in which he pled guilty to second-degree reckless

Crim. P. 11(a)(2) (noting that, in cases involving conditional guilty pleas, "invocation of the harmless error rule is arguably impossible" (internal quotations omitted)); cf. Hooten v. State, 442 S.E.2d 836, 839 (Ga. Ct. App. 1994) (overruling earlier precedent and holding that conditional pleas would no longer be effective in the state of Georgia, reasoning that conditional pleas had, in the past, led to "reversals in some cases even though the appellants have failed to show that they were harmed" and even though "a full trial record might show only harmless error," noting that the harmless error doctrine was inapplicable in those cases because "no trial took place" and "there is no way to determine whether the error asserted resulted in prejudice to the appellant").[18]

We agree with the rationale articulated in these cases. Where there has been no trial on the merits, this Court has no way of knowing whether the defendant "has means of impeaching, discrediting, or casting doubt" on the Commonwealth's evidence, and "[o]nly the accused and his counsel are aware of what favorable evidence is available to them." Hill, 528 P.2d at 29. Any discussion of whether the erroneous denial of a suppression motion was "harmless" would, therefore, require "an unacceptable degree of appellate speculation." Id.[19]

---

homicide, theft from a person, and bail jumping as a habitual offender." (emphasis added)); see also State v. Semrau, 608 N.W.2d 376, 380 (Wis. Ct. App. 2000) (discussing and applying Armstrong in the context of an appeal from a plea agreement). A plea agreement and a conditional guilty plea are, of course, separate and distinct legal arrangements. Regardless, we cite Monahan as merely evidence of a general trend in other jurisdictions, not as conclusive and controlling authority in our own.

[18] The discussion in the Official Comments accompanying Federal Rule 11(a)(2) addressed the concern that the "conditional plea device" might "cause an appellate court to consider constitutional questions which could otherwise have been avoided by invocation of the doctrine of harmless error." This particular phrasing leads to the inference that the Federal Advisory Committee also believed that the harmless error doctrine was ill-suited for application in the context of a conditional plea.

[19] We note that, because Glenn has succeeded in excluding the physical evidence that linked him to the alleged crime, the only remaining evidence on the record is his extrajudicial confession. In order for that confession to constitute sufficient evidence to uphold a conviction,

We further note that Code § 19.2-254 expressly provides that, if a defendant prevails on appeal, he or she may withdraw the conditional guilty plea. As recently noted by the Oregon Court of Appeals, "[e]mploying a harmless error analysis would defeat that statutory right." Dinsmore, 49 P.3d at 838 (concluding that the defendant "may, on remand, decide that she wishes to withdraw her plea and go to trial, or she may choose, in light of her limited success on appeal, not to withdraw it," but that "[t]he legislature . . . has left that choice to defendant").

For these reasons, we hold that, when an appellant prevails on appeal with respect to *any* issue he has preserved for appeal under Code § 19.2-254, that statute implicitly permits the appellant to choose between withdrawing his guilty plea and proceeding to trial, or leaving his guilty plea intact.[20] We expressly decline to consider whether the Commonwealth's remaining evidence constitutes such overwhelming evidence of guilt as to render the trial court's erroneous

---

it must be corroborated by independent evidence. Jefferson v. Commonwealth, 6 Va. App. 421, 424, 369 S.E.2d 212, 214 (1988) ("[A]n extrajudicial confession of an accused that he committed the offense with which he is charged is not, alone and uncorroborated, adequate proof of the *corpus delicti*."). However, because there has been no trial, it would be next-to-impossible for this Court—without resorting to speculation—to determine whether that confession is adequately corroborated by the Commonwealth's remaining evidence. Accordingly, application of the harmless error doctrine would be especially inappropriate under these circumstances.

[20] We do not, as the dissent contends, purport to hold that Code § 8.01-678 has been implicitly repealed by the subsequent enactment of Code § 19.2-254. Code § 8.01-678 provides that,

> [w]hen it plainly appears from the record and from the evidence
> given at the trial that the parties have had a fair trial on the merits
> and substantial justice has been reached, no judgment shall be
> arrested or reversed . . . for any defect, imperfection, or omission
> in the record, or for any error committed on the trial.

According to the Virginia Supreme Court, the applicability of this doctrine turns upon "whether the alleged error substantially influenced the jury." Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001). In cases involving a conditional plea, there is no fact finder whose verdict may have been influenced by the error. We do not in any way hold, then, that Code § 19.2-254 has partially repealed Code § 8.01-678—we hold instead that Code § 8.01-678 is, by its very language, inapplicable.

denial of Glenn's motion to suppress "harmless."  Accordingly, we remand this case to the trial court to permit Glenn, if he so chooses, to withdraw his conditional guilty plea and proceed to trial.

## IV.  CONCLUSION

Although the grandfather's consent vested the law enforcement officers with the authority to conduct a general search of the premises, we hold that an objective police officer could not have reasonably believed that the grandfather also possessed the authority to consent to a search of Glenn's backpack.  Thus, we hold the trial court erred in denying the motion to suppress.  Moreover, because Glenn has prevailed on the merits of one of the issues forming the basis for his conditional guilty plea, we reverse Glenn's convictions and remand this case to the trial court to provide him with the opportunity, if he so chooses, to withdraw his conditional plea and proceed to trial.

Reversed and remanded.

Kelsey, J., dissenting.

The majority opinion imposes a duty to inquire, *ante*, at 12-14, on police officers whenever there appears any ambiguity in the scope of their consensual searching. This proposition strikes me as an unwarranted departure from existing Fourth Amendment doctrine, which historically has examined the permissible scope of a search solely in terms of reasonable reliance on actual or apparent authority.

Applying the traditional standard, I agree with the trial court that the officers in this case did not act unreasonably by relying on the unqualified consent of the homeowner, Glenn's grandfather, to search his home and everything in it that one would ordinarily expect to be within the scope of that consent — like an unidentified, unlocked, unclaimed backpack lying on the floor of a room within the home. This is particularly true here because Glenn never once objected to the search of the room or the backpack. Nor did he express or imply anything suggesting an exclusive privacy interest in either.

I also read the majority opinion to hold that the conditional guilty plea statute, Code § 19.2-254, has effectively repealed by implication the harmless error statute, Code § 8.01-678, for all appeals following a conditional guilty plea. No Virginia case can be cited for this proposition. Nor does anything in the text of the conditional plea statute or in the contextual logic underlying the statute compel such a conclusion. Had the General Assembly intended to render the harmless error statute inapplicable as a matter of law to conditional guilty pleas, I believe it would have said so.

On both grounds, therefore, I respectfully dissent.

I.

"On appeal from a denial of a suppression motion, we must review the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences."

- 26 -

<u>Kyer v. Commonwealth</u>, 45 Va. App. 473, 477, 612 S.E.2d 213, 215 (2005) (*en banc*) (citation omitted).

Believing that Glenn had just robbed a man, police officers went to the home of Glenn's grandparents where Glenn had been living for about two months. Glenn answered the door and was immediately arrested. The officers asked Glenn's grandfather for permission to search his home. Unable to speak because of a medical condition, the grandfather nodded his head in agreement. The officers then asked the grandfather if Glenn paid rent. The grandfather shook his head no. When asked if Glenn was in fact his grandson, the grandfather nodded yes.

The officers went to Glenn's bedroom, identified by Glenn as the "room he slept in." The officers found, among other things, boxes containing his grandmother's clothing in Glenn's bedroom. The officers then went to a second room, identified by Glenn as a room that he also slept in on occasion. There, the officers discovered a backpack on the floor. Nothing suggested to the officers the backpack was locked, used for any particular purpose, or owned by any particular person. During this time, Glenn stood nearby and voiced no objections or concerns about the search. The officers opened the backpack and found evidence implicating Glenn in the suspected robbery.

While in police custody, Glenn confessed to the robbery. He had been given <u>Miranda</u> warnings on three occasions prior to the confession. He did not request legal counsel or insist upon his right to remain silent. Instead, while at the police station, Glenn wrote out a full confession by hand in which he admitted that he and an accomplice robbed the victim at gunpoint. Glenn also gave a verbal confession in which he alerted the officers to where the weapon used in the robbery could be found. Officers later found the weapon exactly where Glenn said it would be.

Prior to trial, Glenn filed two motions to suppress. The first sought to exclude from evidence the incriminating item (the victim's stolen cell phone) found in the backpack, asserting that the search violated the Fourth Amendment. The second challenged the admissibility of his confession on Fifth Amendment grounds. Glenn did not, however, argue that the search of his backpack somehow tainted his confession. Nor does he make this claim on appeal.

At the suppression hearing, Glenn's grandmother took the stand on his behalf and testified that the backpack was his. The grandmother, however, conceded that Glenn did not pay rent. Nor did he have exclusive access to, or control over, any room in the house. She agreed to the characterization of the first room searched as "Keith's room" and "his bedroom." The woman's clothes in Glenn's bedroom were hers, she admitted. There were no locks on the doors of either room.

The trial court denied Glenn's motion to suppress, reasoning that the grandfather's consent to search was given "without reservation or qualification." The scope of this consent, the trial court held, provided the officers with apparent authority to open the backpack. The officers had no reason to question this authority, the court pointed out, because they knew Glenn's grandfather owned the home, Glenn did not pay rent to stay there, a "mixture of personal property" was found in Glenn's principal bedroom, and nothing suggested Glenn had an exclusive privacy interest in the backpack. To be sure, the trial court found, Glenn "was present at the search, observed the search and took no action to countermand his grandfather's permission by advising the police that he objected to the search of that portion of the residence he later claimed he occupied."

At trial, Glenn entered a conditional guilty plea preserving his opportunity to appeal his convictions. After finding the plea to be voluntary, the trial court received a factual proffer from the Commonwealth. The prosecutor reported that Glenn and an accomplice robbed the victim at

gunpoint, taking from him a cell phone and cash.  Glenn confessed to the robbery and advised

the police where to find the weapon.  The trial court asked Glenn if he would "accept the

proffered testimony."  Glenn's counsel said they did.  His counsel added that the police found the

weapon based upon Glenn's confession.[21]  The trial court ended the colloquy this way:

> COURT:                 Mr. Purnell, do you stipulate that the evidence,
>                        if proven, would be sufficient to find the defendant
>                        guilty?
>
> GLENN'S COUNSEL:   I do, Your Honor.
>
> COURT:                 Does the defense wish to offer any evidence other
>                        than the proffer?
>
> GLENN'S COUNSEL:   No.
>
> COURT:                 Would you please stand, Mr. Glenn?  Based on
>                        the evidence that the Court has heard, the Court
>                        will find you guilty as charged . . . .

Based upon the Commonwealth's proffered evidence (stipulated by Glenn as sufficient) and

Glenn's guilty plea (previously found to be voluntary), the trial court convicted Glenn of

robbery, in violation of Code § 18.2-58, and conspiracy to commit robbery, in violation of Code

§ 18.2-22.

Glenn then filed a petition for appeal asserting that his convictions should be overturned

because the trial court erroneously denied his two motions to suppress.  Pursuant to Code

§ 17.1-407(D), a three-judge panel of our Court rejected Glenn's challenge to the admissibility of

his confession.  The Court held that, under the circumstances of this case, Glenn "failed to make

a clear and unambiguous assertion of his right to remain silent."  The Court, however, granted

further review of Glenn's challenge to the admissibility of the evidence found during the

backpack search.

---

[21] Glenn's counsel also claimed the weapon was a "BB gun," but the Commonwealth
replied that "it sure doesn't look like one."

This appeal comes to us in an unusual posture. The Court has already ruled that the trial court properly denied Glenn's motion to suppress his confession. It necessarily follows that the trial court correctly accepted the evidence of Glenn's confession (coupled with the corroborating evidence that it led police to the weapon used in the robbery) in support of the court's finding of guilt. For appellate purposes, two questions remain to be answered:

> A. Did the trial court err in denying the motion to suppress the incriminating evidence found during the backpack search?
>
> B. If so, was any such error harmless given our holding that the trial court correctly denied Glenn's motion to suppress his confession — making it fully admissible, along with the stipulated proffer, in support of Glenn's guilty plea?

The majority concludes the Fourth Amendment exclusionary rule forbids the trial court from considering the backpack evidence and, as a matter of law, the doctrine of harmless error has been superseded by the conditional guilty plea statute. I disagree with both conclusions.

II.

A. THE MOTION TO SUPPRESS — SCOPE OF CONSENT TO SEARCH

Though the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* scrutiny, "we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003) (citations omitted). To prevail on appeal, "the defendant must show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the prosecution, was reversible error." Id. (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003)).

In this case, Glenn argues that his grandfather's consent to search the home did not extend to opening the backpack and examining its contents. The trial court disagreed, as do I.

As a general rule, "a search authorized by consent is wholly valid." Kyer, 45 Va. App. at 483, 612 S.E.2d at 218 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). "Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding." Barkley v. Commonwealth, 39 Va. App. 682, 696, 576 S.E.2d 234, 241 (2003) (quoting United States v. Drayton, 536 U.S. 194, 207 (2002)).[22]

Consent to search can be given by one with actual authority or apparent authority. Actual authority exists if the consenting party has a privacy interest in the premises to be searched, and thus, a concomitant right to waive that interest and authorize the search. See United States v. Matlock, 415 U.S. 164, 170-71 (1974). Apparent authority exists if it merely *appears* to a reasonable officer that the consenting party has "authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 188 (1990). When multiple parties share privacy interests in the premises, any one of them with "common authority over the premises" may consent to the search despite the lack of express concurrence by others possessing a shared privacy interest. Id. at 181.

Here, the trial court found that the grandfather owned the home and consented to its search. The police knew Glenn was staying in his grandfather's home and confirmed that Glenn did not have the status of a renter. From these facts, the police had ample reason to accept the grandfather's consent to search the home and every room in it. No circumstances suggested to the police that Glenn had preserved a private enclave within the home or had somehow undermined the grandfather's authority over all areas of his own home. The police, therefore,

---

[22] The "presence of consent" presents "a factual question." Hargraves v. Commonwealth, 37 Va. App. 299, 307, 557 S.E.2d 737, 741 (2002) (citing Bynum v. Commonwealth, 23 Va. App. 412, 418, 477 S.E.2d 750, 753 (1996)). We thus defer, unless plainly wrong, to the factfinder and give "due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Id. (citations omitted).

crossed no Fourth Amendment boundary by searching either of the two bedrooms in which Glenn slept.

But that boundary was crossed, Glenn argues, when the police opened the backpack and looked inside. Consent should have been specifically requested for searching the backpack, Glenn reasons. Absent such specificity, the majority opinion agrees, the officers have a duty of "further inquiry" whenever there is any "ambiguous situation" concerning the scope of the consent as it applies to "closed containers." *Ante*, at 12-14. I believe this new duty of "further inquiry" to be inconsistent with settled Fourth Amendment doctrine.

Consent to search a space includes consent to search containers within that space where a reasonable officer could construe the consent to extend to the container. See Florida v. Jimeno, 500 U.S. 248, 251 (1991). This principle applies to automobiles, Wyoming v. Houghton, 526 U.S. 295, 302 (1999), as well as physical premises, United States v. Melgar, 227 F.3d 1038, 1041-42 (7th Cir. 2000). "The rule regarding containers found in automobiles applies also to containers found in premises." 27 J. Moore *et al.,* Moore's Federal Practice § 641.44, at 641-151 (3d ed. 2006). "A grant of consent to search premises includes consent to search closed containers found within the premises *unless* the officers have reliable information that the container is not under the control of the person granting consent." Id. (emphasis added).

This conclusion stems from the observation that a "lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." United States v. Ross, 456 U.S. 798, 820-21 (1982). The consent to search a home may reasonably include the "authority to open closets, chests, drawers, and containers" in which the object of the search may be found. Id. at 821. "When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets,

drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." Id. This reasoning "applies equally to all containers, as indeed we believe it must." Id. at 822.[23]

Glenn's duty-of-inquiry argument, particularly the version of it accepted by the majority, inverts the reasonableness test of the Fourth Amendment. The constitutional standard forbidding unreasonable searches has been retooled, in effect, to demand the most reasonable searches. Under the conventional view, the "ambiguous situation" described by the majority, *ante*, at 12, is simply a fact pattern where reasonable officers could differ as to the scope of apparent authority. They may get it wrong, Rodriguez, 497 U.S. at 186, but they nonetheless should be given the benefit of the doubt where reasonable people could construe the circumstances differently. As the Seventh Circuit has explained,

> the real question for closed container searches is which way the risk of uncertainty should run. Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search . . . or is it permissible if the police do not have reliable information that the container is *not* under the authorizer's control.

Melgar, 227 F.3d at 1041 (emphasis in original). Rejecting the duty-to-inquire argument, the Seventh Circuit noted the impracticability of such a doctrine and its express rejection by the United States Supreme Court in other contexts:

> A contrary rule [recognizing a duty of further inquiry] would impose an impossible burden on the police. It would mean that they could never search closed containers within a dwelling

---

[23] The majority comes to the opposite conclusion, in part, based on the belief, see *ante*, at 7, that "Clearly, 'an individual has a heightened expectation of privacy in the contents of a closed container.'" This proposition, however, was clear only to the two-Justice dissent in Jimeno (from which the quoted language comes), not from the Jimeno majority's reasoning or holding. Florida v. Jimeno, 500 U.S. 248, 253 (1991) (Marshall, J., & Stevens, J., dissenting). See also *ante*, at 7, last line, & 13 n.9 (where the majority continues to quote from the Jimeno dissent).

- 33 -

> (including hotel rooms) without asking the person whose consent
> is being given *ex ante* about every item they might encounter. We
> note that there is no possibility of such a rule for automobile
> searches, because the Supreme Court has already authorized this
> type of container search in that context. See Ross, *supra*;
> Houghton, *supra*. Our conclusion here rests in part on the
> discussion in Houghton that indicates that the container rule rests
> on general principles of Fourth Amendment law that do not depend
> on the special attributes of automobile searches.

Id. at 1042. The proper standard, therefore, does not forbid the container search whenever it involves an "ambiguous situation," *ante*, at 12. The Fourth Amendment prohibition applies only when no reasonable officer could interpret the scope of consent — when given by one with apparent authority over the premises — to include containers found on the premises.

Stated another way, a general consent to search "includes consent to search closed containers found within the premises *unless* the officers have reliable information that the container is not under the control of the person granting consent." 27 Moore's Federal Practice, *supra*, § 641.44, at 641-151 (emphasis added); see United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997) (holding that a mother had "apparent authority to consent" to a search of her adult son's bedroom, including a closed vinyl bag found in the bedroom).

Reinforcing these traditional principles, the United States Supreme Court in Georgia v. Randolph, 126 S. Ct. 1515, 1520 (2006), recently addressed the underpinnings of the apparent authority doctrine as applied to the "co-occupant consent" situation. The Court pointed out that police must be permitted to rely on "widely shared social expectations" when discerning the apparent authority of one co-inhabitant to consent to a search of an area in which another co-inhabitant has a dual privacy interest. Id. at 1521.

"Disputed permission," however, undermines that reliance because no reasonable officer could rely on one co-inhabitant's apparent authority to speak for another when the person spoken for is, at that very moment, "expressly refusing consent" to the search. Id. at 1524, 1526. But if

he *does not object*, the co-inhabitant's apparent authority remains secure. As the majority in

Randolph conceded,

> we have to admit that we are drawing a fine line; if a potential
> defendant with self-interest in objecting is in fact at the door and
> objects, the co-tenant's permission does not suffice for a
> reasonable search, whereas the potential objector, nearby but not
> invited to take part in the threshold colloquy, loses out.

Id. at 1527. This approach places the burden on the objector to assert his objection. As

Randolph explains, for the very reason that

> *it would be unjustifiably impractical to require the police to take*
> *affirmative steps to confirm the actual authority of a consenting*
> *individual whose authority was apparent*, we think it would
> needlessly limit the capacity of the police to respond to ostensibly
> legitimate opportunities in the field if we were to hold that
> reasonableness required the police to take affirmative steps to find
> a potentially objecting co-tenant before acting on the permission
> they had already received. There is no ready reason to believe that
> efforts to invite a refusal would make a difference in many cases,
> whereas every co-tenant consent case would turn into a test about
> the adequacy of the police's efforts to consult with a potential
> objector.

Id. at 1527-28 (emphasis added). The reasoning of Randolph, therefore, eschews the duty-to-

inquire thesis advocated by Glenn and adopted by the majority.

Applying these principles here, I believe the trial court correctly held that the factual

circumstances gave the officers no reason to believe that the grandfather's consent to search his

house did not include the backpack laying on the floor in one of the rooms of the house. The

grandfather owned the home, after all, and had not encumbered his prerogatives as a homeowner

by entering into any sort of contractual relationship with Glenn. His relationship with Glenn was

not one of landlord-tenant, but of grandfather-grandson. The backpack was not locked. It was

not found in some secretive place hidden from plain view. No information on the backpack

revealed to whom it belonged — unless we were to speculate that grandsons, but never

grandfathers, use backpacks. The officers did not find the backpack in Glenn's principal

bedroom. Finally, as the trial court held, though Glenn was "present at the search" and "observed the search," he "took no action to countermand his grandfather's permission" and never once advised the police that he objected.

Given these circumstances, I fully agree with the trial court that the grandfather's consent to search the house was "without reservation or qualification" and included a search of the backpack. Nothing in this fact pattern put the officers on notice that the grandfather had been excluded from using the backpack or that Glenn asserted any exclusive privacy interest in it. A reasonable officer, therefore, could construe the scope of the grandfather's consent to the search of his home to permit the opening of an unidentified, unlocked, unclaimed backpack lying on the floor.

## B. HARMLESS ERROR & CONDITIONAL GUILTY PLEAS

After concluding that the officers violated the Fourth Amendment by looking inside the backpack, the majority then holds that the harmless error statute does not apply to this case as a matter of law. Though disclaimed, *ante*, at 24 n.20, the reasoning appears to be that the conditional guilty plea statute, Code § 19.2-254, creates a process so inherently incompatible with the harmless error statute, Code § 8.01-678, that the former has implicitly repealed the latter in all appeals involving conditional guilty pleas. No matter how restated, this assertion is wholly unpersuasive to me.

To begin with, the harmless error concept is no mere prudential, judge-made doctrine of appellate review. It is a legislative mandate, part of our statutory law since the early 1900s, limiting the *ad judicatory* power of Virginia appellate courts.

> Whatever may be the law elsewhere, or whatever it may have been
> aforetime in this State, since the adoption of the Code of 1919
> there has existed in this State a statute which puts a *limitation on
> the powers* of this court to reverse the judgment of the trial court
> — a limitation which we must consider on every application for an
> appeal and on the hearing of *every case* submitted to our judgment.

- 36 -

Walker v. Commonwealth, 144 Va. 648, 652, 131 S.E. 230, 231 (1926) (emphasis added). The General Assembly "deliberately engrafted" the harmless error doctrine into the statutory law of the Commonwealth. Irvine v. Carr, 163 Va. 662, 669, 177 S.E. 208, 211 (1934).

The harmless error limitation on judicial power applies to criminal cases no less than civil cases. Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001). And it has never been a begrudged limitation, but rather one "favored" by Virginia courts, Windsor v. Carlton, 136 Va. 652, 655, 118 S.E. 222, 223 (1923), because it so obviously grows out "of the imperative demands of common sense," Oliver v. Commonwealth, 151 Va. 533, 541, 145 S.E. 307, 309 (1928), and consequently has been "deeply embedded in our jurisprudence," Gilland v. Commonwealth, 184 Va. 223, 235, 35 S.E.2d 130, 134 (1945). For these reasons, Code § 8.01-678 makes "harmless-error review required in *all* cases." Ferguson v. Commonwealth, 240 Va. ix, ix, 396 S.E.2d 675, 675 (1990) (emphasis in original and text in parenthetical).

Glenn essentially argues that, as a matter of law, the harmless error statute has been partially displaced by the conditional guilty plea statute. Virginia, however, follows a long tradition of disfavoring judicial interpretations that in effect hold that one statute has "partially repealed by implication" another. Sexton v. Cornett, 271 Va. 251, 256-57, 623 S.E.2d 898, 901 (2006). This tradition requires us to employ "a presumption against a legislative intent to repeal where the later statute does not amend the former or refer expressly to it." Id.; see also Kremer v. Chem. Constr. Corp., 456 U.S. 461, 468 (1982) (recognizing the presumption against the "implied partial repeal" of an earlier statute by a later one).

Nothing in the text of the conditional guilty plea statute suggests that it has partially repealed the harmless error statute. The conditional guilty plea statute merely preserves a right to appeal a criminal conviction on grounds (like a pretrial order denying a suppression motion) that would have otherwise been waived by an unconditional guilty plea. What is on appeal,

however, is not the interlocutory order denying the suppression motion — it is the conviction itself. As the statute makes plain, the appeal is "from the judgment" entered against the defendant. Code § 19.2-254.

Understood this way, conditional guilty pleas "are like all others, except that the accused reserves a right to contest on appeal a pretrial issue on which he lost." John L. Costello, Virginia Criminal Law & Procedure § 46.2-2, at 617 (3d ed. 2002). But, here again, the right preserved is *the right to appeal*. That right necessarily must be exercised with the expectation that all principles ordinarily applicable to appeals, like the venerable doctrine of harmless error, would likewise apply — particularly where, as in Virginia, the legislative enactment of the doctrine acts as an express limitation on the appellate court's powers.

The implied repeal, Glenn responds, can be inferred from the conditional guilty plea statute for it specifically allows an appellant to withdraw a guilty plea if he "prevails" on appeal. See Code §19.2-254. To me, this argument is at once circular and counterintuitive. No criminal defense attorney would tell a client that he *prevailed* on appeal after receiving an appellate opinion finding the alleged error to be harmless and thus the conviction valid. A criminal defendant prevails on appeal by winning an acquittal or by reducing his punishment. From any practical point of view, appellate success hardly can be claimed when a criminal defendant merely secures from the appellate judges their intellectual acquiescence to the merits of his argument followed immediately by their declaration that, in any event, it does not change the result. Cf. Polston v. Commonwealth, 255 Va. 500, 504, 498 S.E.2d 924, 926 (1998) (ruling a conditional guilty plea would be affirmed "regardless of the actual validity of the search warrant" because the good faith exception to the exclusionary rule would apply). To prevail on appeal means to demonstrate reversible, not irreversible, error.

At any rate, Glenn concludes, harmless error cannot be applied in this case because there has been no trial and thus no way of knowing if the confession could be corroborated by other evidence. Not so. There was a trial. Under Virginia constitutional law, after receiving a guilty plea, "the court shall *try* the case." Va. Const., art. I, § 8 (emphasis added); see also Code § 19.2-257 (providing that, following a guilty plea, "the court shall hear and determine the case"). And that is just what happened in this case. At trial, the Commonwealth proffered evidence that Glenn's confession advised police where to find the weapon used in the robbery. Glenn's counsel advised the trial court that Glenn "accept[ed] the proffered testimony."[24] Glenn's counsel immediately added that, in fact, the police found the weapon used in the robbery based upon Glenn's confession. The trial court asked Glenn's counsel if he wanted to "offer any evidence" in addition to the agreed proffer. He declined to offer any.[25]

Glenn does not argue (and I would not accept it if he did) that, if applicable, the harmless error doctrine cannot be satisfied. The proper admission of a corroborated confession renders harmless the improper admission of mere cumulative evidence. See, e.g., Luginbyhl v. Commonwealth, 48 Va. App. 58, 66, 628 S.E.2d 74, 78-79 (2006) (*en banc*) (finding defendant's

_____

[24] Under settled principles, a "unilateral avowal of counsel of testimony that could be presented constitutes a proper proffer, if unchallenged." Bloom v. Commonwealth, 262 Va. 814, 821, 554 S.E.2d 84, 87 (2001); Whittaker v. Commonwealth, 217 Va. 966, 969, 234 S.E.2d 79, 81 (1977).

[25] That said, the validity of a guilty plea does not require a proffer of evidence by the prosecution. "In accepting a plea of guilty, any Virginia trial judge is, of course, free to hear the evidence he deems necessary," but that does not mean "evidence must be heard upon a plea of guilty." Kibert v. Commonwealth, 216 Va. 660, 664, 222 S.E.2d 790, 793 (1976) (emphasis omitted). Nothing in Virginia law "requires the introduction of evidence to sustain a conviction based upon a plea of guilty in a criminal case." Id. at 665, 222 S.E.2d at 793; see generally Haring v. Prosise, 462 U.S. 306, 316 (1983). So, in cases where, unlike here, there is no proffer at trial of the dispositively incriminating evidence, it may indeed be impractical to conduct a harmless error analysis. From this sensible observation, however, Glenn insensibly reasons that harmless error is thus inapplicable as a matter of law to *all* appeals from *all* conditional guilty pleas.

- 39 -

"corrobored" confession rendered "harmless" any "constitutional error" in admitting cumulative incriminating evidence); United States v. Jiminez, 419 F.3d 34, 41-42 (1st Cir. 2005) (finding that the cumulative evidence "pales in light" of the defendant's voluntary and corroborated confession); Hocker v. State, 840 So. 2d 197, 215 (Ala. Crim. App. 2002) (holding that any error in admitting evidence of a "collateral bad act" was harmless in light of defendant's corroborated confession). To be sure, a "confession is like no other evidence" and is "probably the most probative and damaging evidence that can be admitted against him." Arizona v. Fulminante, 499 U.S. 279, 296 (1991). By rejecting Glenn's only challenge to the admission of his corroborated confession, we rendered harmless any error by the trial court in admitting the mere cumulative evidence (the victim's cell-phone) found in the backpack.

Finally, I offer only a brief rejoinder to the many citations relied on by the majority as justification for abandoning harmless error in this case. As I read them, most of these authorities merely point out the obvious: that, absent a sufficient factual record, the harmless error analysis cannot be competently performed by an appellate court.[26] I certainly agree. The difference here, though, is that we have a sufficient factual record. Other authorities relied upon by the majority

---

[26] The majority cites People v. Grant, 380 N.E.2d 257 (N.Y. 1978), as one of the "two most authoritative" cases rejecting the harmless error analysis. *Ante*, at 19-20. I agree Grant did just that. But the more important point is why. The court explained that the doctrine is "difficult to apply to guilty pleas" because absent "a trial there will be little if any evidence in the record, apart from the proof which should have been excluded," thus leaving the appellate court "rarely" able to competently conduct a harmless error analysis. Id. at 264-65. In our case, however, our competence comes from a stipulated, corroborated confession by the defendant — one which we have held the trial court properly refused to suppress.

People v. Hill, 528 P.2d 1 (Cal. 1974), the other of the "two most authoritative" cases, *ante*, at 19-21, pointed out that the doctrine could not practically be applied because there "simply is no intelligent means of assessing the impact of a particular erroneous refusal to suppress evidence." Id. at 29. Here, too, the holding presupposes an appellate record (unlike ours) which lacks a sufficient factual basis to conduct the harmless error inquiry.

have serious precedential limitations,[27] while still others I think have been either misunderstood[28] or understated.[29]  But, most important, not one of these citations addresses the unique procedures governing the trials of guilty pleas in Virginia's circuit courts or the General Assembly's codification of the harmless error doctrine as a limitation on appellate court power.

III.

In sum, the trial court did not misapply Fourth Amendment principles when it denied Glenn's motion to suppress the evidence found in the search of the backpack.  The majority's invocation of a duty to inquire for container searches rests on an unwarranted extension of

---

[27] The majority cites State v. Monahan, 251 N.W.2d 421, 426 (Wis. 1977), for the proposition that the "harmless error doctrine is inapplicable in the context of an appeal from a conditional guilty plea." *Ante*, at 22.  The same court later said that it did not "read Monahan to preclude, in any way, the use of a harmless error approach" in appeals of conditional guilty pleas.  State v. Armstrong, 591 N.W.2d 604, 604 (Wis. 1999) (*per curiam*).  The defendant in Armstrong entered his guilty plea pursuant to Wis. Stat. § 971.31(10) — which, like Virginia's conditional plea statute, permits an appeal of an "order denying a motion to suppress evidence" despite "the fact that such judgment was entered upon a plea of guilty."  Id.  Cf. *Ante*, at 22 n.17 (mistakenly assuming that Armstrong "did not involve an appeal of a conditional guilty plea").

[28] Footnote 13, *ante*, at 18, cites with approval United States v. Lace, 669 F.2d 46 (2d Cir. 1982), suggesting that only outcome-determinative issues should be allowed under the conditional guilty plea procedure.  Footnote 14, *ante*, at 19, rejects this approach (specifically the Fourth Circuit's restatement of it in United States v. Bundy, 392 F.3d 641 (4th Cir. 2004), which relied on Lace as authority) on the ground that it constitutes an exercise of "judicial fiat."  *Ante*, at 19 n.14.  In any event, this principle — followed by the Second, Third, Fourth, Fifth, and Seventh Circuits — merely places the onus on the trial court to refuse its consent to conditional guilty pleas that would produce appeals destined to fall apart on appeal because of the continuing applicability of the harmless error doctrine.  As Judge Newman's concurring opinion in Lace cautioned, a guilty plea "with a reservation of appellate rights should not be a device to circumvent the harmless error rule."  Lace, 669 F.2d at 57 n.7.  The majority's opinion in our case, I fear, has done just that.

[29] Footnote 16, *ante*, at 22, dismisses the Tenth Circuit's recent decision in United States v. Rivera-Nevarez, 418 F.3d 1104 (10th Cir. 2005), contending that it did not "apply the harmless error doctrine in its traditional sense."  I disagree.  The court expressly found "no reason to believe that a party appealing" pursuant to a conditional guilty plea was "exempt from Rule 52(a)'s [harmless error] requirement that 'any error . . . that does not affect substantial rights must be disregarded.'"  Id. at 1112 n.13.

existing search-and-seizure precedent.  The majority also errs in not conducting a harmless error analysis given our prior ruling rejecting Glenn's only legal challenge to the use of his confession in support of the finding of guilt.  For these reasons, I would affirm Glenn's convictions.